UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

_____

STEFANIE D. HUNTER,
NATHAN A. LIEDL,
ESTATE OF JAXON HUNTER,

              Plaintiffs,                  CASE NO. 20-CV-61

v.

CHIPPEWA COUNTY DEPARTMENT OF
HUMAN SERVICES, TIM EASKER,
SERENA SCHULTZ, and
MATTHEW C. ANDERSON

              Defendants.

_____

## DEFENDANTS' PROPOSED FINDINGS OF FACT

_____

Chippewa County Department of Human Services, Tim Easker, Serena Schultz, and

Matthew C. Anderson, by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C.,

hereby submit these Proposed Findings of Fact.

### I.    Parties

1.    Timothy Easker is the director of the Chippewa County Department of Human Services. (Dkt. 25, Easker Depo. p. 4.)

2.    On July 31, 2018, he became interim director of the Department of Human Services. (Dkt. 25, Easker Depo. p. 5.)

3.    Easker was sworn in as director in early 2019. (Dkt. 25, Easker Depo. p. 5.)

4.    As director, Easker oversees the entire Department of Human Services and reports to the County administrator. (Dkt. 25, Easker Depo. p. 12.)

5.    Serena Schultz has been employed by Chippewa County since May 22, 2017. (Dkt. 26, Schultz Depo. p. 5.)

6. During 2018, her role was the foster care coordinator and her duties were to recruit and license the foster homes and, at times, assist in the placement of foster children. (Dkt. 26, Schultz Depo. p. 6-7.)

7. She remains employed by Chippewa County as a case manager. (Dkt. 26, Schultz Depo. p. 6.)

8. Matthew Anderson worked for Chippewa County from November 2016 through March 2019, originally as a limited-term employee and then as an ongoing Child Protective Services worker. (Schmid Aff. Ex. 5, Anderson Depo. p. 6-8, 13.)

9. An ongoing case worker takes over a case after an initial investigation is concluded and works directly with the needing family on, at least, a monthly basis. (Schmid Aff. Ex. 5, Anderson Depo. p. 8.)

10. As an ongoing case worker, Anderson "communicated with families regularly visiting them at home, working with them in the community, meeting with them in the office, meeting with foster families and/or families providing respite care in the home, over the phone, in the office, and working to coordinate services necessary for both parents and children that fit into the goals of the treatment plan." (Schmid Aff. Ex. 5, Anderson Depo. p. 9.)

11. Stefanie Hunter and Nathan Liedl are the parents of Jaxon Hunter. (Dkt. 21, Amend. Compl. ¶ 2.)

12. Jaxon Hunter passed away at the age of six-months as a result of injuries sustained while at daycare, Amber's Pals & Playmates, which was operated by Amber Sweeney. (Dkt. 29, Amber Depo. p. 6.)

## II. <u>Incident</u>

13. A.F. is a child who was in foster care with Chippewa County. (*See generally*, Schmid Aff. Ex. 2, Children's Court Records.)

14. In September of 2018, A.F. was placed in the foster home of Amber Sweeney, whose home was dual-licensed as both a foster home and daycare (Amber's Pals & Playmates.) (Schmid Aff. Ex. 2, Children's Court Records p. 6, 50.)

15. On October 30, 2018, A.F. was alone in Amber Sweeney's foster home with Jaxon Hunter. (Holum Aff. Ex. 1, Sheriff's Report p. 64-67.)

16. Jaxon Hunter was sleeping inside the home and Amber Sweeney was outside leaf blowing with the other children under her care, which included two 2-year-olds and three other older children. (Dkt. 29, Amber Depo. p. 39-41.)

17.  Amber Sweeney was not using a baby monitor to maintain supervision over Jaxon Hunter and did not have either sight or sound supervision over Jaxon or of A.F. (Dkt. 29, Amber Depo. p. 105-106.)

18. A.F. reported that she went into the Sweeney home and, while inside, she heard Jaxon crying. (Bitar Aff. Ex. 2, p. 7.)

19. A.F. reported that she picked Jaxon out of his crib and attempted to hold him but he slipped out of her arms and she dropped him. (Bitar Aff. Ex. 2, p. 7.)

20. A.F. reported that Jaxon hit his head on a stool and then landed on the floor and continued crying. (Bitar Aff. Ex. 2, p. 7.)

21. A.F. reported that she became scared and stomped on Jaxon's head so she would not get in trouble. (Bitar Aff. Ex. 2, p. 7.)

22. A.F. stated that she then picked Jaxon up, placed him back in his crib, and told him she was sorry. (Bitar Aff. Ex. 2, p. 7.)

23. Upon discovering Jaxon, Amber Sweeney immediately called 911. (Dkt. 29, Amber Depo. p. 44.)

24. Jaxon was placed in a medically induced coma and, two days later, passed away naturally after he was removed from life support. (Schmid Aff. Ex. 6, Stefanie Depo. p. 43.)

25. In the previous ten years, and apart from A.F., no child in Chippewa County out-of-home care has caused the death of another child. (Easker Aff. ¶ 6.)

## III.  **Allegations**

26. Plaintiffs, Stefanie Hunter, Nathan Liedl and the Estate of Jaxon Hunter (hereinafter "Plaintiffs") brought a claim alleging a violation of their rights under the Fourteenth Amendment. (Dkt. 21, Amend. Compl. ¶ 1.)

27. Plaintiffs allege that Defendants, as administrators of the Chippewa County foster care program, were responsible for the safety of individuals who would be in contact with A.F. by way of her foster care placement. (Dkt. 21, Amend. Compl. ¶ 10.)

28. The Plaintiffs assert that A.F. was a dangerous actor, "that the Defendants knew was dangerous, of which they had custody and control, and whom they placed in the home where there were vulnerable children, and failed to warn the foster mother or daycare parents of the danger." (Dkt. 21, Amend. Compl. ¶ 13.)

29. Plaintiffs assert that, based on A.F.'s "condition and history of behavioral, emotional, and anger problems," Defendants "knew that she might violently assault or harm another child." (Dkt. 21, Amend. Compl. ¶ 23.)

30. Plaintiffs assert that "Defendants violated Jaxon's constitutional right by intentionally placing him in a position of known danger, that is, by affirmatively permitting A.F., whose record and history Defendants knew, to be placed into an in home licensed daycare with vulnerable children. The Defendants used their authority to create an opportunity for A.F. to assault Jaxon that would not otherwise have existed. The Defendants also enhanced Jaxon's vulnerability to attack by misrepresenting to the daycare and the parents the risks attending A.F. and/or failing to provide that information although required by law." (Dkt. 21, Amend. Compl. ¶ 29.)

31. Finally, Plaintiffs assert that Defendant Tim Easker should be responsible for the actions of his subordinates because he caused his subordinates conduct in one or more of the following ways: (1) he directed his subordinates to take the action in question; (2) he had actual knowledge of the subordinates' violation of Plaintiffs' constitutional rights and acquiesced in that violation; or (3) with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the violation. (Dkt. 21, Amend. Compl. ¶ 33.)

## IV.    A.F.'s Background

32. In 2017 and 2018, Chippewa County and the surrounding areas experienced an influx of methamphetamine usage and, as a result, also experienced an increase in families requiring social services. (Schmid Aff. Ex. 5, Anderson Depo. p. 11, Dkt. 25, Easker Depo. p. 17.)

33. In 2018, Chippewa County served 217 children in out-of-home care, including foster care, kinship, and residential placement. (Easker Aff. ¶ 5.)

34. Approximately 84% of those placements were related to caregiver methamphetamine abuse. (Easker Aff. ¶ 5.)

35. A.F. was one of those children. (See generally, Schmid Aff. Ex. 2 Children's Court Records)

36. Chippewa County's contact with A.F. began following a report made to the Department of Human Services on September 20, 2017 for neglect. (Schmid Aff. Ex. 2, Children's Court Records p. 55.)

37. At that time, A.F. was 9 years old and was in the third grade at Parkview Elementary School. (Schmid Aff. Ex. 2, Children's Court Records p. 58.)

38. ██████████████████████████████████
    █████████████████████████████

39. ██████████████████████████████████
    █████████████████████████

40. ██████████████████████████████████
    ████████████████████████████

41. ██████████████████████████████████
    ██████████████████████████

42. ██████████████████████████████████
    ██████████████████████████████████
    ██████████████████████████████████
    ██████████████████████████████████
    ██████████████████████████████████
    ██████████████████████████████████
    ████████

43. ██████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
█████████████████████████

████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████

██████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████

████████████████████████████

44. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

45. A.F.'s foster parents, who supervised visits with A.F.'s parents, also noted that A.F's parents lacked appropriate discipline techniques and were "overwhelmed with the children's behaviors and unintentionally reinforce the behaviors due to not having the strength, energy and possibly skills to help the children learn new skills. (Schmid Aff. Ex. 2, Children's Court Records p. 61.)

46. Following the report to CPS and the follow-up investigation, Chippewa County took the following action:

This case is being transferred to an on-going worker due to the children being detained for [A.F.'s parents] methamphetamine use. There are also concerns about domestic violence and their overall parenting that affects the children's safety. This worker referred the family to L.E. Phillips, Family Support Center, and Lutheran Social Services.

` (Schmid Aff. Ex. 2, Children's Court Records p. 63.)

47. The Family Support Center is a nonprofit that helps victims of domestic violence and sexual assault. (Schmid Aff. Ex. 5, Anderson Depo. p. 71-72.)

48. A.F. began initial foster care placement from September 2017 to December 2017. (Schmid Aff. Ex. 5, Anderson Depo. p. 17; Schmid Aff. Ex. 2, Children's Court Records, p. 174.)

49. A.F. then transitioned to temporary placement with a non-relative and unlicensed care provider from December 28, 2017 until April 23, 2018, at which time she was returned to her home. (Schmid Aff. Ex. 2, Children's Court Records, p. 174; Schmid Aff. Ex. 5, Anderson Depo. p. 17.)

50. From April 23, 2018 until August 27, 2018, there are limited reported incidents with Chippewa County regarding A.F. (*See generally*, Schmid Aff. Ex. 2, Children's Court Records.)

51. A.F. was in regular schooling and there were no documented issues with her school performance. (Schmid Aff. Ex. 5, Anderson Depo. p. 45-46.)

52. At times, A.F. was "oppositional" when it came to going to school, but would make it to school. (Schmid Aff. Ex. 2, Children's Court Records p. 135.)

53. Such conduct was interpreted just as it would be for any young child, that is: "being a little defiant about not wanting to go to school . . . but nothing out of the ordinary." (Schmid Aff. Ex. 5, Anderson Depo. p. 54-55.)

54. In June of 2018, police were called to A.F.'s family's home after a neighbor heard yelling. (Schmid Aff. Ex. 2, Children's Court Records p. 137.)

55. Matthew Anderson responded to the home the following day and A.F.'s mother explained that there had been a verbal argument and then A.F.'s father had stepped on a glass and cut his foot. (Schmid Aff. Ex. 2, Children's Court Records p. 141.)



56.

57.

58.

59.

60.

61.

62.





**[redacted]**

83. **[redacted]**

84. Following this report, at the end of August, <u>A.F. was placed in respite with Amber Sweeney</u>. (Dkt. 29, Amber Depo. p. 55.)

85. Amber Sweeney does not recall the exact duration of the respite, but she believes it was "not long" before A.F. was returned to her family (Dkt. 29, Amber Depo. p. 55.)

86. On September 17, 2018, A.F. was interviewed at the Child Advocacy Center regarding the allegations of abuse by her neighbor. (Schmid Aff. Ex. 2, Children's Court Records p. 138.)

87. **[redacted]**

88. **[redacted]**

89. **[redacted]**

90. **[redacted]**

91. On September 19, 2018, a Child Protective Service Report was completed following a call reporting that A.F. had bruises on her arms. (Schmid Aff. Ex. 2, Children's Court Records p. 141.)

92. **[redacted]**

93. **[redacted]**

94. **[redacted]**

95. ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

96. ████████████████████████████████████████
███████████████████████████████

97. █████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

98. ████████████████████████████████████████████
███████████████████████████████

99. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████

100. Chippewa County CPS identified this situation and incident with A.F.'s father as a present danger ████████████████████████████████
████████████████████████████████████████████████
████████████ (Schmid Aff. Ex. 2, Children's Court Records p. 143)

101. ███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

102. Thus, on September 19, 2018, A.F. was removed from her home and again placed with Amber Sweeney for respite. (Schmid Aff. Ex. 2, Children's Court Records p. 6, 50.)

103. On September 21, 2018, the Chippewa County Circuit Court, in a Post-Disposition Emergency Change in Placement Order, ordered that continuation of residence in A.F.'s parents' home was contrary to A.F.'s welfare. (Schmid Aff. Ex. 2, Children's Court Records p. 3.)

104. The order stated that school-based counseling had been initiated for A.F. and a referral was being made to CCS. (Schmid Aff. Ex. 2, Children's Court Records p. 3.)

105. A.F. was thus placed at the residence of Amber Sweeney under foster care. (Schmid Aff. Ex. 2, Children's Court Records p. 4.)

106. On September 24, 2018, Matthew Anderson filed a request with the Circuit Court to extend the September 21, 2018 dispositional order such that it would

remain in effect for one year from the date of the hearing. (Schmid Aff. Ex. 2, Children's Court Records p. 6.)

107.     Anderson's request noted that the County was continuing to offer services and support to A.F.'s family. (Schmid Aff. Ex. 2, Children's Court Records p. 6.)

## V.     Amber's Pals & Playmates Daycare and the Sweeney Foster Home

108.     Amber and Dan Sweeney began operating a daycare, Amber's Pals & Playmates, in 2002. (Dkt. 29, Amber Depo. p. 6.)

109.     Her daycare license was through the State of Wisconsin Department of Children and Families. (Dkt. 29, Amber Depo. p. 10.)

110.     In 2016, Amber began taking children in for respite. (Dkt. 29, Amber Depo. p. 8.)

111.     Respite is a temporary placement of a child outside the home for up to 28 days. (Dkt. 26, Serena Depo. p. 7.)

112.     Amber was certified for respite through the Eau Claire County of Department of Human Services. (Bitar Aff. Ex. 5.)

113.     Amber and Dan Sweeney became licensed foster care parents in October of 2017 and were licensed by Chippewa County as a Level 2 foster home. (Bitar Aff. Ex. 1.)

114.     Wisconsin foster care consists of different levels of care and Foster children have a level and foster homes have a level. (Kerber Aff. ¶ 3.)

115.     The higher the number, the more experience and training a foster home must have and that correlates to the children that are placed in the home. (Kerber Aff. ¶ 3.)

116.     A Level I Child Specific Foster Home requires the foster parent to be a relative of the child or a prior relationship with the child or the child's family. A Level II is a basic foster home. (Kerber Aff. ¶ 4.)

117.     Level III and Level IV Foster Homes are treatment foster homes, where foster parents have several years of experience with foster children and have additional training in order to meet the needs of higher risk children. Level III and Level IV Foster Homes are not licensed by Chippewa County. (Kerber Aff. ¶ 5)

118.     The CANS assessment uses an algorithm, created by the State of Wisconsin, that generates, a child's assessed level of need. A social worker then places the

child in a foster home that matches the child's assessed level of need and is otherwise appropriate for the child's placement. (Kerber Aff. ¶ 6.)

119.    For Amber to obtain her foster care license, both the State of Wisconsin and Chippewa County had to approve of the combining of such care. (Dkt. 29, Amber Depo. p. 10-12.)

120.    Amber signed a stipulation with the State of Wisconsin that required several things:  that Amber obtain written approval from Chippewa County of the combination of both foster children and daycare children in her home, limited the number of children in the home at any given time to 8 children, and notify the State if any foster child began exhibiting certain behaviors in her home, among other requirements. (Bitar Aff. Ex. 3.)

121.    Additionally, Amber obtained an addendum to her foster care license to allow for her to care for more than 8 children in her home. (Bitar Aff. Ex. 4.)

122.    The application for the addendum was approved by Serena Schultz, following an investigation and report of the family and the home, and was signed by Daniel Sweeney. (Bitar Aff. Ex. 4.)

123.    The addendum allowed Amber Sweeney to care for up to 12 children from 4:00 pm until 5:30 pm Monday through Friday from February 16, 2018 until October 23, 2019. (Bitar Aff. Ex. 4.)

124.    At all other times, Amber Sweeney was not allowed to care for more than 8 children. (Bitar Aff. Ex. 4.)

125.    The application for the addendum also noted that Chippewa County had made efforts to increase its support to the Sweeney family and was offering counseling/therapy services to address the needs of the Sweeneys' current foster children. (Bitar Aff. Ex. 4.)

126.    The Department would also increase communication with the Sweeneys, make in-home counseling available, and would allow Amber and Daniel to utilize respite at least one weekend per month. (Bitar Aff. Ex. 4.)

127.    The County also noted: "The Sweeneys have experience providing exceptional care to [] numerous children at a time, as they have demonstrated with their own children and the daycare children in the past." (Bitar Aff. Ex. 4.)

128.    Notably, combining foster care and daycares together does not present concerns in and of itself. (Dkt. 26, Serena Depo. p. 28.)

129.     It is common for foster families to have additional, non-foster children in the home, whether that be daycare children or biological children. (Schmid Aff. Ex. 5, Anderson Depo. p. 35.)

130.     Indeed, as much occurred at the Sweeney home in 2018 even before A.F. was placed there because they had two foster children in addition to their own children plus the daycare children. (Dkt. 29, Amber Depo. p. 65-72.)

**a.  Jaxon Hunter's Enrollment in Amber's Pals & Playmates.**

131.     Stefanie Hunter enrolled Jaxon Hunter at Amber's Pals & Playmates by choice. (Schmid Aff. Ex. 6, Stefanie Depo. p. 20.)

132.     Stefanie had been sending her daughter to the daycare for three years without incident and Stefanie had come to like the Sweeneys. (Schmid Aff. Ex. 6, Stefanie Depo. p. 20.)

133.     Stefanie was aware that the Sweeneys were also foster parents and was aware that A.F. had come into their home as a foster child. (Schmid Aff. Ex. 6, Stefanie Depo. p. 22.)

134.     Stefanie had met A.F. while picking up her children from the daycare, had conversations with A.F., and would see A.F. when dropping off and picking her children up. (Schmid Aff. Ex. 6, Stefanie Depo. p. 25.)

**b.  A.F.'s Time in the Sweeney Foster Home.**

135.     Prior to receiving A.F. as a foster child, the Sweeneys were foster parents to two other children who had experienced similar pasts to A.F., specifically the following: sexual abuse, neglect, emotional abuse, difficulty with attachment, school troubles, and other behavioral issues. (Dkt. 29, Amber Depo. p. 65-72.)

136.     There were no concerns that the Sweeneys were not equipped to handle the needs of such children. (Bitar Aff. Ex. 4.)

137.     While A.F. was in her home, Amber Sweeney liked A.F. and believed that A.F. had a good heart. (Dkt. 29, Amber Depo. p. 57, 79.)

138.     During A.F.'s time in the Sweeney household, Amber Sweeney did not witness A.F. exhibiting any concerning behaviors. (Dkt. 29, Amber Depo. p. 58-60.)

139.     A.F. did not have any tantrums or meltdowns. (Dkt. 29, Amber Depo. p. 84.)

140.    Amber did not witness A.F. exhibiting behaviors of physical or sexual abuse, assault or abuse of animals, or setting fires or other behaviors requiring intensive supervision. (Dkt. 29, Amber Depo. p. 59-60.)

141.    Nor did Amber ever witness or hear from another child that A.F. had physically or sexually abused another child. (Dkt. 29, Amber Depo. p. 60.)

142.    A.F. never reported to Amber that she was suicidal, wanted to harm herself, or wanted to harm another child. (Dkt. 29, Amber Depo. p. 78.)

143.    Amber did not find A.F. to be malicious or unkind. (Dkt. 29, Amber Depo. p. 72-73.)

144.    Indeed, Amber acknowledges that she was good to A.F. and A.F. was good to her. (Dkt. 29, Amber Depo. p. 60.)

145.    In fact, after A.F. completed her first respite stay at the Sweeneys' home and was then returned to the Sweeneys' home in September 2018, Amber stated that she was "happy" to once again see A.F. because "she was a sweet young lady." (Dkt. 29, Amber Depo. p. 135.)

146.    Amber had no concerns with bringing A.F. into her home a second time. (Dkt. 29, Amber Depo. p. 135.)

147.    Further, Daniel Sweeney also testified that, during A.F.'s time in the Sweeney household, A.F. interacted "fine" with himself, his wife (Amber), and the other children in the home. (Dkt. 28, Daniel Depo. p. 29.)

148.    Daniel Sweeney never witnesses A.F. exhibiting aggressive behavior toward anyone in the home. (Dkt. 28, Daniel Depo. p. 29.)

149.    Daniel Sweeney described A.F. as being "quiet," "reserved," and similar to other foster children they had in their home. (Dkt. 28, Daniel Depo. p. 30.)

150.    On September 27, 2018, shortly after A.F.'s second placement at Amber's, Matthew Anderson visited the home and spoke with Amber regarding A.F.'s placement. (Schmid Aff. Ex. 2, Children's Court Records p. 49.)

151.    Amber indicated there were no concerns regarding A.F. (Schmid Aff. Ex. 2, Children's Court Records p. 49.)

152.    Thus, from Social Worker Anderson's perspective, it appeared that A.F.'s behaviors that, in part, led to her removal from her parents' home were not witnessed during times that she was outside of her parents' home. (Schmid Aff. Ex. 5, Anderson Depo. p. 67-68.)

153.     Stefanie never heard from Amber that there were any concerns with A.F. (Schmid Aff. Ex. 6, Stefanie Depo. p. 26.)

154.     Nor did Stefanie ever witness A.F. exhibiting any concerning, inappropriate, or aggressive behavior. (Schmid Aff. Ex. 6, Stefanie Depo. p. 27.)

155.     Nor did Stefanie witness A.F. engaging in self-harm or acting out. (Schmid Aff. Ex. 6, Stefanie Depo. p. 27.)

156.     Stefanie similarly did not witness or know of any emotional problems of A.F. (Schmid Aff. Ex. 6, Stefanie Depo. p. 27.)

157.     Because she was a foster child, Stefanie assumed that there was "trouble somewhere" in A.F.'s past but did not find it concerning. (Schmid Aff. Ex. 6, Stefanie Depo. p. 30.)

158.     Rather, Stefanie believed A.F. to be a normal 10-year-old and believed that A.F. was getting along well in the Sweeney foster home. (Schmid Aff. Ex. 6, Stefanie Depo. p. 27.)

159.     At the time, Stefanie believed that the County's placement of A.F. in the Sweeney foster home was suitable. (Schmid Aff. Ex. 6, Stefanie Depo. p. 31.)

160.     Stefanie acknowledges seeing A.F. playing with Jaxon and even holding Jaxon. (Schmid Aff. Ex. 6, Stefanie Depo. p. 28.)

161.     Stefanie had no concerns with A.F. playing with or holding Jaxon. (Schmid Aff. Ex. 6, Stefanie Depo. p. 28.)

162.     Stefanie was also aware that A.F. and Stefanie's daughter were friends. (Schmid Aff. Ex. 6, Stefanie Depo. p. 29.)

## VI.   Placement of A.F. in the Sweeney Foster Home.

### a.   Decision to Place A.F.

163.     Matthew Anderson was the ongoing case worker for A.F.'s family, had been working with A.F.'s family for a year, knew the family well, and communicated with the family often. (Schmid Aff. Ex. 5, Anderson Depo. p. 15.)

164.     When Anderson was first introduced to A.F. and her family, her and her siblings were in foster care with the another family. (Schmid Aff. Ex. 5, Anderson Depo. p. 17.)

165.     Anderson described A.F. and her siblings as being typical of other foster care children: "like all foster kids, they had trauma and the instability of being

removed from home and had been witness to domestic violence. So like 99 percent of foster kids, they – they had things to work through." (Schmid Aff. Ex. 5, Anderson Depo. p. 18.)

166.     Matthew Anderson understood A.F. He understood that A.F. saw her parents as being responsible for the instability in her life, and that was why she acted out towards them. (Schmid Aff. Ex. 5, Anderson Depo. p. 29.)

167.     He understood that her relationship with her parents was "push-pull" in that, on the one hand, she loved her parents and wanted to cling to them, but on the other hand, A.F. viewed her parents as the cause for the chaos around her. (Schmid Aff. Ex. 5, Anderson Depo. p. 30.)

168.     Anderson was aware of A.F.'s mother taking her Sacred Heart and understood that medical staff believed A.F.'s behavior was superficial ████████ ████████████ (Schmid Aff. Ex. 5, Anderson Depo. p. 48.)

169.     He understood that, if medical staff had believed that A.F. was truly a danger to herself or others, they would have hospitalized her somewhere. (Schmid Aff. Ex. 5, Anderson Depo. p. 84.)

170.     He also understood that A.F.'s behavioral issues were isolated to her home life. (Schmid Aff. Ex. 5, Anderson Depo. p. 67-68.)

171.     Anderson first met Amber Sweeney while looking for a respite location for A.F. in August of 2018. (Schmid Aff. Ex. 5, Anderson Depo. p. 24.)

172.     He personally brought A.F. to the Sweeney residence and spent time there. (Schmid Aff. Ex. 5, Anderson Depo. p. 24.)

173.     He was aware that Amber Sweeney also operated a daycare. (Schmid Aff. Ex. 5, Anderson Depo. p. 24.)

174.     Additionally, A.F.'s CANS report indicated that her assessed level of need (1or 2) matched the licensing for Amber Sweeney's foster home – which was a level 2 foster home. (Schmid Aff. Ex. 4, CANS Report, p. 1.)

175.     CANS stands for Child and Adolescent Needs and Strengths. (Schmid Aff. Ex. 4, CANS Report, p. 1.)

176.     The CANS tool is used for any child placed in out-of-home care to determine their level of need in a home as well as services needed. (Brott Aff. ¶ 2.)

177.     The tool asks questions about the child's needs and strengths in different areas such as school, trauma, mental health needs, and risk behaviors; some of these

areas focus on the child's lifetime, while other areas focus on what the child has experienced in the last thirty days. (Brott Aff. ¶ 3.)

178.     Once the tool is completed, three results will appear: a mental health screen to determine whether a child has mental health needs, a level of need to recommend a level of placement for the child based on their identified needs and strengths, and a supplemental rate to be included in the foster care reimbursement. (Brott Aff. ¶ 4.)

179.     The level of care a child needs can range from one to six – one being a minimal level of care while six is a very high level of care. (Brott Aff. ¶ 5.)

180.     When placing a child in out-of-home care, a child's assessed level of need should be equal to or less than the out-of-home provider's level of care, all of which is populated into the CANS report. (Brott Aff. ¶ 6.)

181.     Depending on the score of the CANS report, certain language regarding a child's needs may auto-populate, such as that a "child needs to be seen by a mental health professional or should be under the care of a mental health professional." (Brott Aff. ¶ 7.)

182.     The "mental health professional" referred to is a counselor. (Brott Aff. ¶ 8.) When such language does auto-populate, a social worker could refer a child to Comprehensive Community Services ("CCS") where the child may receive such mental health services. (Brott Aff. ¶ 9.)

183.     Three CANS reports were completed for A.F. – on October 18, 2017, January 27, 2018, and September 19, 2018 – and each report indicated that A.F.'s assessed level of need was in a Level 1 or Level 2 foster home. (Schmid Aff. Ex. 4, CANS Report p. 1, 11, 20.)

184.     Chippewa County social workers were required to complete extensive training regarding the CANS rating system. (Schmid Aff. Ex. 5, Anderson Depo. p. 20.)

185.     Both Amber and Daniel Sweeney believed A.F. worked well in her home. According to Anderson, A.F.'s parents felt like they had good rapport with Amber Sweeney and "that [A.F.] was doing well there." (Schmid Aff. Ex. 5, Anderson Depo. p. 62.)

186.     Amber Sweeney was aware that, if she did not believe a foster child was an appropriate fit in her home, she could call the County and discuss other options. (Dkt. 29, Amber Depo. p. 88.)

187.     However, Amber never reported any inappropriate or escalating behavior by A.F. to either Chippewa County (under her foster care license) or to the State of Wisconsin (under her daycare license). (Dkt. 29, Amber Depo. p. 60, 89.)

188.     Prior to such placement, Anderson conferred with his Chippewa County supervisor, Amber Sweeney, and A.F.'s mother to discuss A.F.'s needs and to discuss the best placement option. (Anderson Aff. ¶ 3.)

189.     Everyone involved-- that is, Anderson, Anderson's supervisor, Amber Sweeney, and A.F.'s mother -- determined that placement in the Sweeney foster home was the best, least restrictive, and most natural placement. (Anderson Aff. ¶ 3.)

190.     A.F. was previously placed in the Sweeney's home and, therefore, A.F. and the Sweeneys were familiar with each other. (Anderson Aff. ¶ 3.)

191.     Additionally, A.F. had previously done well in the Sweeney household during respite, A.F.'s mother approved of her placement there, and Amber Sweeney welcomed her into her home for this second time. (Anderson Aff. ¶ 3.)

192.     Anderson also considered A.F.'s rapport with Amber Sweeney, as well as the importance of existing relationships and not disrupting a child's life further with new relationships. (Schmid Aff. Ex. 5, Anderson Depo. p. 32.)

193.     Finally, A.F.'s assessed needed level of care matched that of the Sweeney foster home. (Kerber Aff. ¶ 7.)

194.     A full hearing on A.F.'s placement was held on September 21, 2018. (Schmid Aff. Ex. 2, Children's Court Records p. 4.)

195.     A court order for placement in the Sweeneys' home was signed thereafter. (Schmid Aff. Ex. 2, Children's Court Records p. 4.)

**b.   Services Provided to A.F. and the Sweeneys.**

196.     Anderson recognized that A.F. struggled to deal with the sexual assault by her neighbor and, as a result, sought out additional services for A.F., in addition to removing her from the apartment complex where her abused lived. (Schmid Aff. Ex. 5, Anderson Depo. p. 96-97.)

197.     School-based counseling had been initiated for A.F., and A.F.'s family was also receiving family counseling. (Schmid Aff. Ex. 2, Children's Court Records p. 3.)

198.     Additionally, a referral had been made to Comprehensive Community Services (CCS) on A.F.'s behalf. (Schmid Aff. Ex. 2, Children's Court Records p. 3.)

199.     CCS is a state program administered at the county level. (Easker Aff. ¶ 5.)

200.     CCS provides a flexible array of individualized community-based psycho-social rehabilitation services authorized by a mental health professional to consumers with mental health and or substance use issues across the lifespan. (Easker Aff. ¶ 5.)

201.     Community Support Program services are provided for individuals who are in need of a higher intensity services than CCS, and CCS services are provided when an individual needs more than outpatient mental health services. (Easker Aff. ¶ 6.)

202.     CCS is completely voluntary and is not court-ordered. (Easker Aff. ¶ 7.)

203.     The services provided by CCS include: Screening and Assessment, Service and Planning, Service Facilitation, Diagnostic Evaluations, Medication Management, Physical Health Monitoring, Peer Support, Individual Skill Development, Employment-Related Skill Training, Individual and/or Family Psychoeducation, Wellness Management and Recovery/Recovery Support Services, Psychotherapy, Substance Use Treatment, Non-Traditional or other Approved Services. (Easker Aff. ¶ 8.)

204.     Children enter the CCS program via the Single Point of Entry which is Chippewa County Public Health's, Western Regional Center for Children and Youth with Special Health Care needs, which may be done via a referral from a social worker. (Easker Aff. ¶ 9.)

205.     The enrollment process for CCS begins with the intake process where eligibility is determined, and an application is signed by the consumer (adult) of the Parent/guardian (in the case of children). (Easker Aff. ¶ 10.)

206.     Basic eligibility includes the following: being a Chippewa County resident, qualifies for Medical Assistance (MA), mental health and or substance use diagnosis, functional limitation in one or more major life activities caused by mental health or substance use issues as measure by the functional screen and need for psychosocial rehabilitation services. (Easker Aff. ¶ 11.)

207.     Chippewa County has 30 days to open the person to CCS (if eligible) after an application has been signed. (Easker Aff. ¶ 12.)

208.     Additionally, during and after placement, Anderson remained in regular contact with Amber Sweeney. (Schmid Aff. Ex. 5, Anderson Depo. p. 28.)

209.    Anderson "had open communication with Amber on a number of occasions" both in-person and by phone, and was available when necessary. (Schmid Aff. Ex. 5, Anderson Depo. p. 101.)

210.    During her time at the Sweeneys', Anderson estimated he saw A.F. on a weekly basis. (Schmid Aff. Ex. 5, Anderson Depo. p. 104-105.)

211.    Amber Sweeney liked Matt as a person and believed she clicked with him in their working relationship. (Dkt. 29, Amber Depo. p. 91.)

212.    Amber testified that she found Anderson to be busy, compassionate, "kind-hearted and looking out for a child's heart." (Dkt. 29, Amber Depo. p. 93.)

213.    Amber never believed that Anderson was intentionally withholding information from her about A.F. (Dkt. 29, Amber Depo. p. 91.)

214.    Amber Sweeney estimated Anderson was at her home approximately three times during the period that A.F. was with her. (Dkt. 29, Amber Depo. p. 90.)

215.    She further testified that Anderson was available to her by phone whenever she had a question. (Dkt. 29, Amber Depo. p. 90.)

216.    While working with Anderson, Amber felt that he was doing an adequate job of providing her information. (Dkt. 29, Amber Depo. p. 93.)

**c.   Information Provided to Amber Sweeney About A.F.**

217.    Amber Sweeney had A.F. in her home for respite before and was familiar with her. (Dkt. 29, Amber Depo. p. 56.)

218.    Based upon the previous respite and additional conversations with Anderson, Amber believed that A.F. would be a natural transition into her home for foster care (Schmid Aff. Ex. 5, Anderson Depo. p. 32.)

219.    Anderson verbally communicated A.F.'s history to Amber, including that A.F. was angry with her parents, fighting with her brothers, the assault by the neighbor boy and A.F.'s mental health, ███████████████████████ ████████████████████████ (Schmid Aff. Ex. 5, Anderson Depo. p. 29-30; 98-100.)

220.    Amber told investigators that she was aware that A.F. was recently assaulted by a neighbor, that there was an incident where ████████████████████ ████████████████████████ (Holum Aff. Ex. 1, Sheriff's Report p. 72).

221. In a follow-up interview, she told investigators that she was also aware that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and had spoken to a social worker about A.F.'s needs regarding the same. (Holum Aff. Ex. 1, Sheriff's Report p. 84.)

222. She also told investigators that she had been given paperwork that stated that A.F. had been aggressive towards her brothers. (Holum Aff. Ex. 1, Sheriff's Report p. 84.)

223. Amber provided the Sheriff's Department with a binder of information regarding A.F. (Holum Aff. Ex. 1, Sheriff's Report p. 84.)

224. Those documents, while not all of the documents Amber had been given regarding A.F., consisted of the following:

1) Notice of Hearing, Extension Hearing for November 6, 2018
2) Extend Dispositional Order dated November 24, 2018 and seeking an extension until November 7, 2018 and indicating that "[t]he Department is continuing to offer services and support to the family through the State Post Reunification Grant program until early 2019."
3) A ForwardHealth Identification Card in the name of A.F.
4) Notice of Hearing, Change in Placement Hearing for October 10, 2018
5) A letter from A.F.'s mother dated May 8, 2018 indicating that she had not received notice of a hearing.
6) A handwritten note indicating the following:
   i. Respite Sept. 27-29; Oct. 5-7; 19-21
   ii. A.F.'s name, age, school, teacher, bus, date-of-birth, names of parents, name of social worker.
   iii. Left blank, were handwritten notes for address, approve respite, Dr. name, dentist name, Any Apts., any meds
7) A medical services consent form for A.F.
8) A treatment of minors in parent / legal guardian absence form completed for A.F. to receive any and all emergent, urgent, medical, mental health, and dental treatment at Marshfield Clinic/Family Health Center.
9) A release of information authorization completed for A.F. allowing Marshfield Clinic to release all of A.F.'s medical records to Amber Sweeney, including, but not limited to, medical history and notes, laboratory/pathology reports, consults, prescriptions, hospital records, school records, and other records and further allowed the disclosure to Amber Sweeney of mental health treatment notes and other notes.

(Holum Aff. Ex. 1, Sheriff's Report, Ex. 2, Evidence Item 27.)

225.    Amber Sweeney admitted to investigators that she shredded at least one additional document that contained a note stating that A.F. had been aggressive toward her brothers. (Holum Aff. Ex. 1, Sheriff's Report. p. 84.)

226.    In addition to the information noted above, Anderson completed an authorization for Amber Sweeney to receive or request any and all information related to A.F. from the Chippewa Falls United School District. (Schmid Aff. Ex. 2, Children's Court Records p. 45.)

227.    Anderson further testified that he is certain he would have provided the Out-of-Home Care Provider Part B form to Amber Sweeney. (Schmid Aff. Ex. 5, Anderson Depo. p. 39.) It was his practice to always provide the form to a foster parent. (Schmid Aff. Ex. 5, Anderson Depo. p. 39.)

228.    In her deposition testimony, Amber expressed knowledge of the following information either before or while A.F. was placed in her home: ███████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

(Dkt. 29, Amber Depo. p. 74-82.)

229.    Amber acknowledges that she would not be entitled to review the child services records held by Chippewa County. (Dkt. 29, Amber Depo. p. 54.)

230.    Indeed, these records are protected by Wis. Stat. § 48.78 and Wis. Stat. § 48.917(7).

## VII.    Foreseeability

231.    No one predicted, nor could they have predicted, that this tragedy would have occurred. From the perspective of the social worker closest to A.F.– Matthew Anderson – none of A.F.'s behaviors could be classified as "concerning to other children or other individuals in general." (Schmid Aff. Ex. 5, Anderson Depo. p. 37.)

232.    As noted above, the Sweeneys never witnessed or reported A.F. exhibiting any concerning behavior. Amber Sweeney testified that she did not think "for one minute" that A.F. would have harmed another child in her home. (Holum Aff. Ex. 1, Sheriff's Report, p. 84.)

233.     As noted earlier, on the day of the incident, she left A.F. and the infant unattended from her sight and sound while leaf blowing. Similarly, Daniel Sweeney testified that he did not think that A.F. would harm an infant – "not in a million years." (Dkt. 28, Daniel Depo. p. 30.)

234.     Stefanie testified, prior to this incident, the Sweeney household was operating normally. (Schmid Aff. Ex. 6, Stefanie Depo. p. 35-36.)

235.     Both Plaintiff parents understood "this could have happened to anybody." (Schmid Aff. Ex. 6, Stefanie Depo. p. 36.)

236.     Stefanie previously witnessed A.F. picking up, holding, and playing with A.F. and was not concerned by such conduct. (Schmid Aff. Ex. 6, Stefanie Depo. p. 25.)

237.     Moreover, Stefanie believes that A.F. dropping Jaxon was, itself, an accident. (Schmid Aff. Ex. 6, Stefanie Depo. p. 36-37.)

238.     However, Stefanie believes A.F.'s reaction – stomping on Jaxon's head – was malicious. (Schmid Aff. Ex. 6, Stefanie Depo. p. 36-37.)

239.     To this day, Stefanie remains "pretty good friends" with Amber Sweeney. (Schmid Aff. Ex. 6, Stefanie Depo. p. 51.)

## VIII.     Sweeney Home After the Incident.

240.     Amber Sweeney was cited by Wisconsin Department of Children and Families for the following violations:

1. 250.05(3)(i) Close Supervision Of Children. Description: Per rule, each child shall be closely supervised by a provider to guide the child's behavior and activities, prevent harm and assure safety. Because the provider didn't have sight or sound of an infant in care, she was unaware the baby was being harmed by another child, to the point of death.
2. 250.05(3)(i) Supervision of Children While Outdoors: Description: Per rule, a provider shall be outside with children providing sight and sound supervision of the children unless the children are playing inside the enclosed outdoor area on the premises, as specified under s. DCF 250.06(11)(b). On the day of this incident, the children in care were not in the enclosed play space but instead allowed to run around and in and out of the provider's home, removing themselves from sight and sound supervision of the provider.

(Bitar Aff. Ex. 6.)

241.     Upon threat of revocation of her daycare license, Amber Sweeney voluntarily surrendered her daycare license. (Bitar Aff. Ex. 7.)

242.     Amber Sweeney also ended her foster care license. (Dkt. 29, Amber Depo. p. 50.)


Dated this 9th day of April 2021.

                              **MUNICIPAL LAW & LITIGATION GROUP, S.C.**

                              Attorneys for Defendants, Chippewa County Department of Human Services, Tim Easker, Serena Schultz and Matthew C. Anderson


                              By:____/s/ Samantha R. Schmid_____
                                      REMZY D. BITAR
                                      State Bar No: 1038340
                                      SAMANTHA R. SCHMID
                                      State Bar No. 1096315

P.O. ADDRESS:
730 N. Grand Avenue
Waukesha, WI 53186
O: (262) 548-1340
F:  (262) 548-9211
E: rbitar@ammr.net
sschmid@ammr.net