UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STEFANIE D. HUNTER,
NATHAN A. LIEDL,
ESTATE OF JAXON HUNTER,

                     Plaintiffs,                              CASE NO. 20-CV-61

v.

CHIPPEWA COUNTY DEPARTMENT OF
HUMAN SERVICES, TIM EASKER,
SERENA SCHULTZ, and
MATTHEW C. ANDERSON

                     Defendants.

## DEFENDANTS'
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Chippewa County Department of Human Services, Tim Easker, Serena Schultz, and Matthew C. Anderson, by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., hereby submit this Brief in Support of their Motion for Summary Judgment.

## <u>INTRODUCTION</u>

Cases involving allegations of failure to protect under *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195 (1989) are often the most sad and tragic. This case is no exception. This lawsuit involves a 10-year-old foster child who was being fostered in a home that also received children as part of a day care operation. The child picked up an infant from his crib, something she had done before. However, she accidentally dropped the infant and then she reacted by kicking the infant's head leading to the infant's death. Almost every foster child has an emotional and behavioral background. So did this foster child. But her background, which was

also unfortunate, would not have given any social worker or foster care worker reason to believe that she would react in such a way and would cause harm to another human, let alone another child. Because the full record of her background and the defendants' involvement in and decision-making for her foster care placement does not support the allegations being made under the stringent standards governing a claim under *DeShaney*, this lawsuit must be dismissed.

## FACTS

### I.  Parties.

Timothy Easker is the director of the Chippewa County Department of Human Services. (DFOF ¶ 1.) On July 31, 2018, he became interim director of the Department of Human Services. (DFOF ¶ 2.) Easker was sworn in as director in early 2019. (DFOF ¶ 3.) As director, Easker oversees the entire Department of Human Services and reports to the County administrator. (DFOF ¶ 4.)

Serena Schultz has been employed by Chippewa County since May 22, 2017. (DFOF ¶ 5.) During 2018, her role was the foster care coordinator and her duties were to recruit and license the foster homes and, at times, assist in the placement of foster children. (DFOF ¶ 6.) She remains employed by Chippewa County as a case manager. (DFOF ¶ 7.)

Matthew Anderson worked for Chippewa County from November 2016 through March 2019, originally as a limited-term employee and then as an ongoing Child Protective Services worker. (DFOF ¶ 8.) An ongoing case worker takes over a case after an initial investigation is concluded and works directly with the needing family on, at least, a monthly basis. (DFOF ¶ 9.) As an ongoing case worker, Anderson "communicated with families regularly visiting them at home, working with them in the community, meeting with them in the office, meeting with foster families and/or families providing respite care in the home, over the phone, in the office, and

working to coordinate services necessary for both parents and children that fit into the goals of the treatment plan." (DFOF ¶ 10.)

Stefanie Hunter and Nathan Liedl are the parents of Jaxon Hunter. (DFOF ¶ 11.) Jaxon Hunter passed away at the age of six-months as a result of injuries sustained while at daycare, Amber's Pals & Playmates, which was operated by Amber Sweeney. (DFOF ¶ 12.)

## II. **Incident.**

A.F. is a child who was in foster care with Chippewa County. (DFOF ¶ 13.) In September of 2018, A.F. was placed in the foster home of Amber Sweeney, whose home was dual-licensed as both a foster home and daycare (Amber's Pals & Playmates.) (DFOF ¶ 14.)

On October 30, 2018, A.F. was alone in Amber Sweeney's foster home with Jaxon Hunter. (DFOF ¶ 15.) Jaxon Hunter was sleeping inside the home and Amber Sweeney was outside leaf blowing with the other children under her care, which included two 2-year-olds and three other older children. (DFOF ¶ 16.) Amber Sweeney was not using a baby monitor to maintain supervision over Jaxon Hunter and did not have either sight or sound supervision over Jaxon or of A.F. (DFOF ¶ 117.)

A.F. reported that she went into the Sweeney home and, while inside, she heard Jaxon crying. (DFOF ¶ 18.) A.F. reported that she picked Jaxon out of his crib and attempted to hold him but he slipped out of her arms and she dropped him. (DFOF ¶ 19.) A.F. reported that Jaxon hit his head on a stool and then landed on the floor and continued crying. (DFOF ¶ 20.) A.F. reported that she became scared and stomped on Jaxon's head so she would not get in trouble. (DFOF ¶ 21.) A.F. stated that she then picked Jaxon up, placed him back in his crib, and told him she was sorry. (DFOF ¶ 22.)

Upon discovering Jaxon, Amber Sweeney immediately called 911. (DFOF ¶ 23.) Jaxon was placed in a medically induced coma and, two days later, passed away naturally after he was removed from life support. (DFOF ¶ 24.)

Following this incident, Amber Sweeney was cited by the State of Wisconsin and was forced to withdraw her daycare license. (DFOF ¶ 240-242.) In the previous ten years, and apart from A.F., no child in Chippewa County out-of-home care has caused the death of another child. (DFOF ¶ 25.)

**III.   <u>Allegations Against the County Defendants.</u>**

Plaintiffs, Stefanie Hunter, Nathan Liedl and the Estate of Jaxon Hunter (hereinafter "Plaintiffs") brought a claim alleging a violation of their rights under the Fourteenth Amendment. (DFOF ¶ 26.)

Plaintiffs allege that Defendants, as administrators of the Chippewa County foster care program, were responsible for the safety of individuals who would be in contact with A.F. by way of her foster care placement. (DFOF ¶ 27.) The Plaintiffs assert that A.F. was a dangerous actor, "that the Defendants knew was dangerous, of which they had custody and control, and whom they placed in the home where there were vulnerable children, and failed to warn the foster mother or daycare parents of the danger." (DFOF ¶ 28.) Plaintiffs assert that, based on A.F.'s "condition and history of behavioral, emotional, and anger problems," Defendants "knew that she might violently assault or harm another child." (DFOF ¶ 29.)

Plaintiffs assert that "Defendants violated Jaxon's constitutional right by intentionally placing him in a position of known danger, that is, by affirmatively permitting A.F., whose record and history Defendants knew, to be placed into an in home licensed daycare with vulnerable children. The Defendants used their authority to create an opportunity for A.F. to assault Jaxon

that would not otherwise have existed. The Defendants also enhanced Jaxon's vulnerability to attack by misrepresenting to the daycare and the parents the risks attending A.F. and/or failing to provide that information although required by law." (DFOF ¶ 30.)

Finally, Plaintiffs assert that Defendant Tim Easker should be responsible for the actions of his subordinates because he caused his subordinates conduct in one or more of the following ways: (1) he directed his subordinates to take the action in question; (2) he had actual knowledge of the subordinates' violation of Plaintiffs' constitutional rights and acquiesced in that violation; or (3) with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the violation. (DFOF ¶ 31.)

## IV.   A.F.'s Background

A.F.'s family and social history, discussed more fully in the materials filed under seal, is tragic and includes sexual abuse, domestic abuse, and overall chaos and lack of a family structure. The defendants do not believe that much of her history and the detail offered in the summary judgment record is material under the governing legal standards of a failure to protect claim; however, the Plaintiffs' lawsuit has many generic allegations about her "behavioral, emotional, and anger problems" that "she might violently assault or harm another child," see e.g., Amd. Complaint Para. 23, such that the full context is offered without waiving any arguments about the future relevance or admissibility of any of that information.

In 2017 and 2018, Chippewa County and the surrounding areas experienced an influx of methamphetamine usage and, as a result, also experienced an increase in families requiring social services. (DFOF ¶ 32.) In 2018, Chippewa County served 217 children in out-of-home care, including foster care, kinship, and residential placement. (DFOF ¶ 33.) Approximately 84% of

those placements were related to caregiver methamphetamine abuse. (DFOF ¶ 34.) A.F. was one

of those children. (DFOF ¶ 35.)

Chippewa County's contact with A.F. began following a report made to the Department of

Human Services on September 20, 2017 for neglect. (DFOF ¶ 36.) At that time, A.F. was 9 years

old and was in the third grade at Parkview Elementary School. (DFOF ¶ 37.)

Records contained within A.F.'s Children's Court file show that A.F.'s home life was

chaotic, unsanitary, and, at times, dangerous. By all accounts, A.F.'s parents failed to provide her

with appropriate care and shelter. (DFOF ¶ 38-107 .) A.F.'s parents were drug users and lacked

appropriate disciplinary techniques, and A.F. witnessed domestic violence in the home. (DFOF

¶ 38-47.) A.F. exhibited some behavioral issues in her parents' home, including arguing with her

parents and hitting and pinching her brothers. (DFOF 38-47.)

Following a report to CPS regarding A.F.'s home life and the follow-up investigation that

determined that A.F. was the victim of neglect, Chippewa County took the following action:

> This case is being transferred to an on-going worker due to the children being detained for
> [A.F.'s parents] methamphetamine use. There are also concerns about domestic violence
> and their overall parenting that affects the children's safety. This worker referred the family
> to L.E. Phillips, Family Support Center, and Lutheran Social Services.

(DFOF ¶ 38-46.) Family Support Center is a nonprofit that helps victims of domestic violence and

sexual assault. (DFOF ¶ 47.)

A.F. began initial foster care placement from September 2017 to December 2017. (DFOF

¶ 48.) A.F. then transitioned to temporary placement with a non-relative and unlicensed care

provider from December 28, 2017 until April 23, 2018, at which time she was returned to her

home. (DFOF ¶ 49.)

From April 23, 2018 until August 27, 2018, there are limited reported incidents with

Chippewa County regarding A.F. (DFOF ¶ 50.) A.F. was in regular schooling and there were no

documented issues with her school performance. (DFOF ¶ 51.) At times, A.F. was "oppositional" when it came to going to school, but would make it to school. (DFOF ¶ 52.) Such conduct was interpreted just as it would be for any young child, that is: "being a little defiant about not wanting to go to school . . . but nothing out of the ordinary." (DFOF ¶ 53.) A.F.'s parents, however, had additional legal trouble. (DFOF ¶ 54.)

In late August, A.F.'s mother sought medical treatment and hospitalization for A.F. (DFOF ¶ 56-80.) It was reported that A.F. had been sexually assaulted by a neighbor who had continued to harass her. (DFOF ¶ 56-80.) As a result, A.F. had engaged in self-harming behaviors. (DFOF ¶ 56-80.) A.F.'s mother sought hospitalization for A.F. as a means to remove her from her abuser, but medical staff declined to hospitalize her due to her age and A.F.'s mother declined hospitalization elsewhere. (DFOF ¶ 56-80.)

On August 28, 2018, a Child Protective Services Report was completed by Chippewa County upon notification that A.F. had been sexually assaulted. (DFOF ¶ 81.) The report relayed the information that had been provided to hospital staff. Chippewa County then conducted an investigation into the allegations. (DFOF ¶ 82-90.) During this investigation, A.F. spoke of an incident where she was upset that her brother did not get in trouble for hitting and she responded by throwing something in the car and the object accidentally hit her mother. (DFOF ¶ 88-89.)

Following this report, at the end of August, A.F. was placed in respite with Amber Sweeney. (DFOF ¶ 84.)  "Respite" is discussed further below; essentially, allowed a cooling off period between children and parents.  Amber Sweeney does not recall the exact duration of the respite, but she believes it was "not long" before A.F. was returned to her family (DFOF ¶ 85.)

On September 19, 2018, a Child Protective Service Report was completed following a call reporting that A.F. had bruises on her arms. (DFOF ¶ 91.) While facts were later disputed among

and between A.F. and her family – and her family alleged A.F. had been trying to run away -  the CPS report suggested that there was domestic violence in A.F.'s home and that such violence had been directed toward her. (DFOF ¶ 91-100.)

As a result of the CPS report, on September 19, 2018, A.F. was removed from her home and again placed with Amber Sweeney for respite. (DFOF ¶ 101-102.)

On September 21, 2018, the Chippewa County Circuit Court, in a Post-Disposition Emergency Change in Placement Order, ordered that continuation of residence in A.F.'s parents' home was contrary to A.F.'s welfare because some of the events surrounding her at the time (discussed in detail in the proposed facts at 91 through 103 ) led the court to conclude that A.F. should remain in the Sweeneys' because she had become aggressive with her brothers and parents and because she had tried to run away." (DFOF ¶ 103.)  The order stated that school-based counseling had been initiated for A.F. and a referral was being made to CCS. (DFOF ¶ 104.)  A.F. was thus placed at the residence of Amber Sweeney under foster care. (DFOF ¶ 105.)

On September 24, 2018, Matthew Anderson filed a request with the Circuit Court to extend the September 21, 2018 dispositional order such that it would remain in effect for one year from the date of the hearing. (DFOF ¶ 106.)  Anderson's request noted that the County was continuing to offer services and support to A.F.'s family. (DFOF ¶ 107.)

V.   **Amber's Pals & Playmates and the Sweeney Foster Home.**

Amber and Dan Sweeney began operating a daycare, Amber's Pals & Playmates, in 2002. (DFOF ¶ 108.)  Amber's daycare license was through the State of Wisconsin Department of Children and Families. (DFOF ¶ 109.)

In 2016, Amber began taking children in for respite. (DFOF ¶ 110.)  Respite is a temporary placement of a child outside the home for up to 28 days. (DFOF ¶ 111.)  Amber was certified for

respite through the Eau Claire County of Department of Human Services. (DFOF ¶ 112.) Amber and Dan Sweeney became licensed foster care parents in October of 2017 and were licensed by Chippewa County as a Level 2 foster home. (DFOF ¶ 113)[1]

For Amber to obtain her foster care license, both the State of Wisconsin and Chippewa County had to approve of the combining of such care. (DFOF ¶ 119.)  Amber signed a stipulation with the State of Wisconsin that required several things:  that Amber obtain written approval from Chippewa County of the combination of both foster children and daycare children in her home, limited the number of children in the home at any given time to 8 children, and required her to notify the State if any foster child began exhibiting certain behaviors in her home, among other requirements. (DFOF ¶ 120.)

Additionally, Amber obtained an addendum to her foster care license to allow for her to care for more than 8 children in her home. (DFOF ¶ 121.)  The application for the addendum was approved by Serena Schultz, following an investigation and report of the family and the home, and was signed by Daniel Sweeney. (DFOF ¶ 122.) The addendum allowed Amber Sweeney to care for up to 12 children from 4:00 pm until 5:30 pm Monday through Friday from February 16, 2018 until October 23, 2019. (DFOF ¶ 123.)  At all other times, Amber Sweeney was not allowed to care for more than 8 children. (DFOF ¶ 124.)

---

[1] Wisconsin foster care consists of different levels of care. Foster children have a level and foster homes have a level. (DFOF ¶ 114.)  The higher the number, the more experience and training a foster home must have and that correlates to the children that are placed in the home. (DFOF ¶ 115.)  A Level I Child Specific Foster Home requires the foster parent to be a relative of the child or a prior relationship with the child or the child's family. A Level II is a basic foster home that can address a variety or range of foster care needs but does not offer the services of a Level III or IV home. (DFOF ¶ 116.)  Level III and Level IV Foster Homes are treatment foster homes, where foster parents have several years of experience with foster children and have additional training in order to meet the needs of higher risk children. (DFOF ¶ 117.)  Level III and Level IV Foster Homes are not licensed by Chippewa County. (DFOF ¶ 117.)  The CANS assessment uses an algorithm, created by the State of Wisconsin, that generates, a child's assessed level of need. (DFOF ¶ 118.)  A social worker then places the child in a foster home that matches the child's assessed level of need and is otherwise appropriate for the child's placement. (DFOF ¶ 118.)

The application for the addendum also noted that Chippewa County had made efforts to increase its support to the Sweeney family and was offering counseling/therapy services to address the needs of the Sweeneys' current foster children. (DFOF ¶ 125.) The Department would also increase communication with the Sweeneys, make in-home counseling available, and would allow Amber and Daniel to utilize respite at least one weekend per month. (DFOF ¶ 126.)  The County also noted: "The Sweeneys have experience providing exceptional care to [] numerous children at a time, as they have demonstrated with their own children and the daycare children in the past." (DFOF ¶ 127.)

Notably, combining foster care and daycares together does not present concerns in and of itself. (DFOF ¶ 128.) It is common for foster families to have additional, non-foster children in the home, whether that be daycare children or biological children. (DFOF ¶ 129.)  Indeed, as much occurred at the Sweeney home in 2018 even before A.F. was placed there because they had two foster children in addition to their own children plus the daycare children. (DFOF ¶ 130.)

### a.  Jaxon Hunter's Enrollment at Amber's Pals & Playmates.

Stefanie Hunter enrolled Jaxon Hunter at Amber's Pals & Playmates by choice. (DFOF ¶ 131.)  Stefanie had been sending her daughter to the daycare for three years without incident and Stefanie had come to like the Sweeneys. (DFOF ¶ 132.) Stefanie was aware that the Sweeneys were also foster parents and was aware that A.F. had come into their home as a foster child. (DFOF ¶ 133.) Stefanie had met A.F. while picking up her children from the daycare, had conversations with A.F., and would see A.F. when dropping off and picking her children up. (DFOF ¶ 134.)

### b.  A.F.'s Time in the Sweeney Foster Home.

Prior to receiving A.F. as a foster child, the Sweeneys were foster parents to two other children who had experienced similar pasts to A.F., specifically the following: sexual abuse,

neglect, emotional abuse, difficulty with attachment, school troubles, and other behavioral issues. (DFOF ¶ 135.) There were no concerns that the Sweeneys were not equipped to handle the needs of such children. (DFOF ¶ 136.)

By all accounts, A.F. got along and was doing well in the Sweeney foster home. While A.F. was in her home, Amber Sweeney liked A.F. and believed that A.F. had a good heart. (DFOF ¶ 137.) During A.F.'s time in the Sweeney household, Amber Sweeney did not witness A.F. exhibiting any concerning behaviors. (DFOF ¶ 138.) A.F. did not have any tantrums or meltdowns. (DFOF ¶ 139.) Amber did not witness A.F. exhibiting behaviors of physical or sexual abuse, assault or abuse of animals, or setting fires or other behaviors requiring intensive supervision. (DFOF ¶ 140.) Nor did Amber ever witness or hear from another child that A.F. had physically or sexually abused another child. (DFOF ¶ 141.) A.F. never reported to Amber that she was suicidal, wanted to harm herself, or wanted to harm another child. (DFOF ¶ 142.) Amber did not find A.F. to be malicious or unkind. (DFOF ¶ 143.) Indeed, Amber acknowledges that she was good to A.F. and A.F. was good to her. (DFOF ¶ 144.)

In fact, after A.F. completed her first respite stay at the Sweeneys' home and was then returned to the Sweeneys' home in September 2018, Amber stated that she was "happy" to once again see A.F. because "she was a sweet young lady." (DFOF ¶ 145.) Amber had no concerns with bringing A.F. into her home a second time. (DFOF ¶ 146.)

Further, Daniel Sweeney also testified that, during A.F.'s time in the Sweeney household, A.F. interacted "fine" with himself, his wife (Amber), and the other children in the home. ((DFOF ¶ 147.) Daniel Sweeney never witnesses A.F. exhibiting aggressive behavior toward anyone in the home. (DFOF ¶ 1148.) Daniel Sweeney described A.F. as being "quiet," "reserved," and similar to other foster children they had in their home. (DFOF ¶ 1149.)

On September 27, 2018, shortly after A.F.'s second placement at Amber's, Matthew Anderson visited the home and spoke with Amber regarding A.F.'s placement. (DFOF ¶ 150.) Amber indicated there were no concerns regarding A.F. (DFOF ¶ 151.) Thus, from social worker Anderson's perspective, it appeared that A.F.'s behaviors that, in part, led to her removal from her parents' home were not witnessed during times that she was outside of her parents' home. (DFOF ¶ 152.)

Similarly, Jaxon Hunter's parents had no complaints regarding A.F. being in the Sweeneys' home. As noted above, Stefanie was aware that Amber Sweeney was a foster mother and had foster children, including A.F. in her home.

Stefanie never heard from Amber that there were any concerns with A.F. (DFOF ¶ 153.) Nor did Stefanie ever witness A.F. exhibiting any concerning, inappropriate, or aggressive behavior. (DFOF ¶ 154.) Nor did Stefanie witness A.F. engaging in self-harm or acting out. (DFOF ¶ 155.) Stefanie similarly did not witness or know of any emotional problems of A.F. (DFOF ¶ 156.) Because she was a foster child, Stefanie assumed that there was "trouble somewhere" in A.F.'s past, but did not find it concerning. (DFOF ¶ 157.) Rather, Stefanie believed A.F. to be a normal 10-year-old and believed that A.F. was getting along well in the Sweeney foster home. (DFOF ¶ 158.) At the time, Stefanie believed that the County's placement of A.F. in the Sweeney foster home was suitable. (DFOF ¶ 159.)

Stefanie acknowledges seeing A.F. playing with Jaxon and even holding Jaxon. (DFOF ¶ 160.) Stefanie had no concerns with A.F. playing with or holding Jaxon. (DFOF ¶ 161.) Stefanie was also aware that A.F. and Stefanie's daughter were friends. (DFOF ¶ 162.)

VI.    **Placement of A.F. in the Sweeney Foster Home.**

      a.    **Decision to Place A.F. in the Sweeney Foster Home.**

Matthew Anderson was the ongoing case worker for A.F.'s family, had been working with A.F.'s family for a year, knew the family well, and communicated with the family often. (DFOF ¶ 163.)  When Anderson was first introduced to A.F. and her family, her and her siblings were in foster care with another family. (DFOF ¶ 164.) Anderson described A.F. and her siblings as being typical of other foster care children: "like all foster kids, they had trauma and the instability of being removed from home and had been witness to domestic violence. So like 99 percent of foster kids, they – they had things to work through." (DFOF ¶ 165.)

Matthew Anderson understood A.F. He understood that A.F. saw her parents as being responsible for the instability in her life, and that was why she acted out towards them. (DFOF ¶ 166.) He understood that her relationship with her parents was "push-pull" in that, on the one hand, she loved her parents and wanted to cling to them, but on the other hand, A.F. viewed her parents as the cause for the chaos around her. (DFOF ¶ 167.) Anderson was aware of A.F.'s mother taking her to the hospital and understood that medical staff believed A.F.'s behavior was superficial and that she lacked the capacity to understand what she was doing. (DFOF ¶ 168.)  He understood that, if medical staff had believed that A.F. was truly a danger to herself or others, they would have hospitalized her somewhere. (DFOF ¶ 169.) He also understood that A.F.'s behavioral issues were isolated to her home life. (DFOF ¶ 170.)

Anderson first met Amber Sweeney while looking for a respite location for A.F. in August of 2018. (DFOF ¶ 171.) He personally brought A.F. to the Sweeney residence and spent time there. (DFOF ¶ 172.) He was aware that Amber Sweeney also operated a daycare. (DFOF ¶ 173.) Additionally, A.F.'s CANS report indicated that her assessed level of need (1or 2) matched the licensing for Amber Sweeney's foster home – which was a level 2 foster home. (DFOF ¶ 174.) [2]

---

[2] CANS stands for Child and Adolescent Needs and Strengths. (DFOF ¶ 175.) The CANS tool is used for any child placed in out-of-home care to determine their level of need in a home as well as services needed. (DFOF ¶ 176.) The

Three CANS reports were completed for A.F. – on October 18, 2017, January 27, 2018, and September 19, 2018 – and each report indicated that A.F.'s assessed level of need was in a Level 1 or Level 2 foster home. (DFOF ¶ 183.) Chippewa County social workers were required to complete extensive training regarding the CANS rating system. (DFOF ¶ 184.)

As noted earlier, the Sweeneys were a Level 2 foster home.  A.F. had done well in Amber Sweeney's home for all days of her placement there up to the day of this incident, both as a respite placement and the conversion to foster care placement. As noted above, both Amber and Daniel Sweeney believed A.F. worked well in her home. According to Anderson, A.F.'s parents felt like they had good rapport with Amber Sweeney and "that [A.F.] was doing well there." (DFOF ¶ 185.)

Amber Sweeney was aware that, if she did not believe a foster child was an appropriate fit in her home, she could call the County and discuss other options. (DFOF ¶ 186.) However, Amber never reported any inappropriate or escalating behavior by A.F. to either Chippewa County (under her foster care license) or to the State of Wisconsin (under her daycare license). (DFOF ¶ 187.)

Prior to A.F.'s foster care placement with the Sweeneys', Anderson conferred with his Chippewa County supervisor, Amber Sweeney, and A.F.'s mother to discuss A.F.'s needs and to discuss the best placement option. (DFOF ¶ 188.) Everyone involved-- that is, Anderson,

---

tool asks questions about the child's needs and strengths in different areas such as school, trauma, mental health needs, and risk behaviors; some of these areas focus on the child's lifetime, while other areas focus on what the child has experienced in the last thirty days. (DFOF ¶ 177.) Once the tool is completed, three results will appear: a mental health screen to determine whether a child has mental health needs, a level of need to recommend a level of placement for the child based on their identified needs and strengths, and a supplemental rate to be included in the foster care reimbursement. (DFOF ¶ 178.) The level of care a child needs can range from one to six – one being a minimal level of care while six is a very high level of care. (DFOF ¶ 179.)

When placing a child in out-of-home care, a child's assessed level of need should be equal to or less than the out-of-home provider's level of care, all of which is populated into the CANS report. (DFOF ¶ 180.) Depending on the score of the CANS report, certain language regarding a child's needs may auto-populate, such as that a "child needs to be seen by a mental health professional or should be under the care of a mental health professional." (DFOF ¶ 181.) The "mental health professional" referred to is a counselor. (DFOF ¶ 182.) When such language does auto-populate, a social worker could refer a child to Comprehensive Community Services ("CCS") where the child may receive such mental health services. ((DFOF ¶ 182.)

Anderson's supervisor, Amber Sweeney, and A.F.'s mother -- determined that placement in the Sweeney foster home was the best, least restrictive, and most natural placement. (DFOF ¶ 189.) A.F. was previously placed in the Sweeney's home and, therefore, A.F. and the Sweeneys were familiar with each other. ((DFOF ¶ 190.) Additionally, A.F. had previously done well in the Sweeney household during respite, A.F.'s mother approved of her placement there, and Amber Sweeney welcomed her into her home for this second time. (DFOF ¶ 191.) Anderson also considered A.F.'s rapport with Amber Sweeney, as well as the importance of existing relationships and not disrupting a child's life further with new relationships. (DFOF ¶ 192.) Finally, A.F.'s assessed needed level of care matched that of the Sweeney foster home. (DFOF ¶ 193.)

A full hearing on A.F.'s placement was held on September 21, 2018. (DFOF ¶ 194.) A court order for placement in the Sweeneys' home was signed thereafter. (DFOF ¶ 195.)

**b.   <u>Services Provided to A.F. and the Sweeneys.</u>**

Anderson and Chippewa County also worked to provide A.F. with appropriate services during this time. Anderson recognized that A.F. struggled to deal with the sexual assault by her neighbor and, as a result, sought out additional services for A.F., in addition to removing her from the apartment complex where her abused lived. (DFOF ¶ 196.)

School-based counseling had been initiated for A.F., and A.F.'s family was also receiving family counseling. (DFOF ¶ 197.)

Additionally, a referral had been made to Comprehensive Community Services (CCS) on A.F.'s behalf, which would have provided her additional services, including mental health services and counseling. (DFOF ¶ 198-207.)

Additionally, during and after placement, Anderson remained in regular contact with Amber Sweeney. (DFOF ¶ 208.) Anderson "had open communication with Amber on a number

of occasions" both in-person and by phone, and was available when necessary. (DFOF ¶ 209.) During her time at the Sweeneys', Anderson estimated he saw A.F. on a weekly basis. (DFOF ¶ 210.) Amber Sweeney did not have any complaints about Anderson and enjoyed working with him. (DFOF ¶ 211-216.)

       **c.**  **Information Provided to Amber Sweeney About A.F.**

Prior to this incident, Amber Sweeney was aware of A.F.'s trauma history and her family dynamics.

*First*, Amber Sweeney had A.F. in her home for respite before and was familiar with her. (DFOF ¶ 217.) Based upon the previous respite and additional conversations with Anderson, Amber believed that A.F. would be a natural transition into her home for foster care (DFOF ¶ 218.)

*Second*, Anderson verbally communicated A.F.'s history to Amber, including that A.F. was angry with her parents, fighting with her brothers, the assault by the neighbor boy and A.F.'s mental health following, A.F. attempting to run away, and the cutting that lead to her mother taking her to the hospital. (DFOF ¶ 219.)

*Third*, Amber told investigators immediately following the incident <u>that she was aware of all of the major incidents in A.F.'s life</u>. Amber stated that she was aware that A.F. was recently assaulted by a neighbor, that there was an incident where A.F. was trying to leave her home through a window and that her father bruised her arm (DFOF ¶ 220.) In a follow-up interview, she told investigators that she was also aware that A.F. had been suicidal and had spoken to a social worker about A.F.'s needs regarding the same. (DFOF ¶ 221.) She also told investigators that she had been given paperwork that stated that A.F. had been aggressive towards her brothers. (DFOF ¶ 222.)

*Fourth*, Amber provided the Sheriff's Department with a binder of information regarding

A.F. (DFOF ¶ 223.) Those documents, while not all of the documents Amber had been given

regarding A.F., consisted of the following:

1) Notice of Hearing, Extension Hearing for November 6, 2018
2) Extend Dispositional Order dated November 24, 2018 and seeking an extension until November 7, 2018 and indicating that "[t]he Department is continuing to offer services and support to the family through the State Post Reunification Grant program until early 2019."
3) A ForwardHealth Identification Card in the name of A.F.
4) Notice of Hearing, Change in Placement Hearing for October 10, 2018
5) A letter from A.F.'s mother dated May 8, 2018 indicating that she had not received notice of a hearing.
6) A handwritten note indicating the following:
   i. Respite Sept. 27-29; Oct. 5-7; 19-21
   ii. A.F.'s name, age, school, teacher, bus, date-of-birth, names of parents, name of social worker.
   iii. Left blank, were handwritten notes for address, approve respite, Dr. name, dentist name, Any Apts., any meds
7) A medical services consent form for A.F.
8) A treatment of minors in parent / legal guardian absence form completed for A.F. to receive any and all emergent, urgent, medical, mental health, and dental treatment at Marshfield Clinic/Family Health Center.
9) A release of information authorization completed for A.F. allowing Marshfield Clinic to release all of A.F.'s medical records to Amber Sweeney, including, but not limited to, medical history and notes, laboratory/pathology reports, consults, prescriptions, hospital records, school records, and other records and further allowed the disclosure to Amber Sweeney of mental health treatment notes and other notes.[3]

(DFOF ¶ 224.)

In addition to the information noted above, Anderson completed an authorization for

Amber Sweeney to receive or request any and all information related to A.F. from the Chippewa

Falls United School District. (DFOF ¶ 226.) Anderson further testified that he is certain he would

have provided the Out-of-Home Care Provider Part B form to Amber Sweeney. (DFOF ¶ 227.) It

was his practice to always provide the form to a foster parent. (DFOF ¶ 228.)

---

[3] Amber Sweeney admitted to investigators that she shredded at least one additional document that contained a note stating that A.F. had been aggressive toward her brothers. (DFOF ¶ 225.)

*Finally*, in her deposition testimony, Amber expressed knowledge of the following information either before or while A.F. was placed in her home: A.F.'s father had bruised her arms, A.F. had been assaulted by a neighbor,  A.F.'s mother was chaotic and did not provide structure in the home and allowed her brothers to "run amuck;" A.F.'s home life was "a volatile situation;" there had been drug use in the home; A.F. had been neglected; A.F. had previously engaged in self-harm and Amber had spoken to her about it; and A.F. and her siblings had a "normal sibling rivalry." (DFOF ¶ 228.)

Amber acknowledges that she would not be entitled to review the child services records held by Chippewa County. (DFOF ¶ 229.) Indeed, these records are protected by Wis. Stat. § 48.78 and Wis. Stat. § 48.917(7). (DFOF ¶ 230.)

## VII.    Foreseeability of the Incident.

No one predicted, nor could they have predicted, that this tragedy would have occurred. From the perspective of the social worker closest to A.F.– Matthew Anderson – none of A.F's behaviors could be classified as "concerning to other children or other individuals in general." (DFOF ¶ 231.)

As noted above, the Sweeneys never witnessed or reported A.F. exhibiting any concerning behavior. Amber Sweeney testified that she did not think "for one minute" that A.F. would have harmed another child in her home. (DFOF ¶ 232.) As noted earlier, on the day of the incident, she left A.F. and the infant unattended from her sight and sound while leaf blowing. Similarly, Daniel Sweeney testified that he did not think that A.F. would harm an infant – "not in a million years." (DFOF ¶ 233.)

Stefanie testified, prior to this incident, the Sweeney household was operating normally. ((DFOF ¶ 234.) Both Plaintiff parents understood "this could have happened to anybody." (DFOF

¶ 235.) As discussed above, Stefanie previously witnessed A.F. picking up, holding, and playing with Jaxon and was not concerned by such conduct. (DFOF ¶ 236.) Moreover, Stefanie believes that A.F. dropping Jaxon was, itself, an accident. (DFOF ¶ 237.) However, Stefanie believes A.F.'s reaction – stomping on Jaxon's head – was malicious. (DFOF ¶ 238.) To this day, Stefanie remains "pretty good friends" with Amber Sweeney. (DFOF ¶ 239.)

Without doubt, and understandably, A.F. exhibited some behavioral issues while she was in her parents' home. A.F. watched as her parents threw her life into chaos through domestic violence and drug use, and she was forced to confront an abuser regularly. However, it is undisputed that no one who came in contact with A.F. predicted that she would have intentionally injured another child.

## STANDARD OF REVIEW

Summary judgment is proper if the record shows there are no genuine issues of material fact and establishes the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is outcome determinative of an issue. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). The movant must show there are no disputes of material fact and that judgment should be granted as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The respondent must then "produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Ulichny v. Marton*, 249 F.3d 686 (7th Cir. 2001). The mere existence of some immaterial factual disputes will not defeat a properly supported motion for summary judgment—nor will speculation, hearsay or conclusory allegations suffice. *Gorbitz v. Corvilla,* 196 F.3d 879 (7th Cir. 1999).

## ARGUMENT

**I.    The Fourteenth Amendment Claim Must Be Dismissed As A Matter Of Law.**

The Due Process Clause of the Fourteenth Amendment "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Deshaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195 (1989). Thus, "a state ordinarily has no constitutional duty to protect private citizens doing harm to each other, so that state's failure to protect an individual from private injury does not violate that individual's due process rights." *Waubanascum v. Shawano County*, 416 F.3d 658, 665 (7th Cir. 2005).

However, two exceptions are recognized to the general rule of no duty to protect set forth in *Deshaney*: (1) when the state has a "special relationship" with an individual; and (2) when the state "affirmatively places a particular individual in a position of danger the individual would not have otherwise faced." *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)

Plaintiffs' Amended Complaint asserts only a claim under the state created danger exception and, therefore, this is the only exception addressed by Defendants.

### a. Chippewa County Did Not Create A Danger to Jaxon Hunter.

The state created danger exception cannot be met in this case. The elements of the state created danger exception were articulated by the Seventh Circuit in *King ex rel. King v. East St. Louis School District 189*:

> First, … the state, by its affirmative acts, must create or increase a danger faced by an individual; [s]econd, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual (…and the plaintiff must be the foreseeable victim of a defendant's acts in a tort sense); [t]hird, … the state's failure to protect the individual must shock the conscience.

496 F.3d 812 (7th Cir. 2007) (citations omitted). A claim under the state created danger exception survives only if a plaintiff shows the state affirmatively placed a particular individual in a position of danger the individual would not otherwise have faced. *Stevens v. Umsted*, 131 F.3d 697, 705 (7th Cir. 1997) (citations omitted).

The Seventh Circuit narrowly interprets the state created danger exception.  "Only the most egregious official conduct will satisfy the stringent inquiry. Making a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation." *Jackson v. Indian Prairie Sch. Dist*. 204, 653 F.3d 647, 654-55 (7th Cir. 2011)(citations omitted).

### i. Chippewa County Did Not Create Or Increase The Danger To Jaxon Hunter.

Application of the state created danger exception requires a showing that state officials created the dangerous conditions through their affirmative acts. *See Sandage v. Bd. of Commr's of Vanderburgh Cty.,* 548 F.3d 595, 600 (7th Cir. 2008) ("'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect. If all that were required was a causal relation between inaction and harm, the rule would be undone, since, had it not been for the state's inaction in *DeShaney*, there would have been no injury.").

In determining whether a danger is "increased," a court must consider whether "the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Windle v. City of Marion, Ind*., 321 F.3d 658, 662 (7th Cir. 2003). However, "'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect. *Sandage,* 548 F.3d at 600.  Thus, a plaintiff must show more than merely a causal relationship. *Id*.

It is important to note that the Seventh Circuit has never held that the placement of a foster child, who later injured another individual, is an affirmative act subject to the state created danger exception. Indeed, in the Seventh Circuit, in the context of child placement, agency officials and case workers are liable *only if* they violated "the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows*

*or suspects to be a child abuser.*" *K.H. v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990) (emphasis in original).

Moreover, Plaintiffs' claim must fail under the "knowledge or suspicion" standard required as part of the affirmative act. *See Lewis v. Anderson*, 308 F.3d 768, 773-74 (7th Cir. 2002). There is no evidence in the record that Chippewa County had any knowledge or suspicion that A.F. was or could be physically abusive toward another child. A.F. had never seriously injured another individual – adult or child – before. And while the record does show she engaged in some sibling rivalry (hitting and pinching her brother) such conduct does not rise to the level of knowledge or suspicion that she would gravely harm another child.

For example, in *Lewis v. Anderson,* the Seventh Circuit found that an adult slapping a child, even when such behavior was known and admitted to, was not enough to constitute knowledge or suspicion of child abuse. 308 F.3d at 774. "A single hitting of a child (without more evidence of the severity of the consequences than we have here) does not necessarily constitute child abuse; were that the case, nearly any practitioner or case worker who has ever witnessed a slapping of a child would be under a legal duty to report the occurrence to the designated agency – and every parent who ever slapped or spanked a child would face the possibility of losing custody of the child." *Id*.

Similarly here, the records do not reveal any predictors of physical abuse or action by A.F. toward others or even her own family members. While she certainly lived in a chaotic home due to the actions of her parents and even had stereotypical sibling rivalry once or twice, the full record of her behavior and history does not rise to the level where one can say that social workers or foster care placement workers would have had knowledge or suspicion that A.F. would cause harm to another child, let alone stomp on the head of an infant. If attenuated connection could be drawn

from her record, then no child requiring protective services would ever be able to be placed in a foster home where, by example, she had pinched or hit her sibling, became defiant to her parents in a home whose parents had failed in the basic measures of parenting due to their drug use or where such a child developed the unfortunately all-to-common behavioral, emotional and mental health complications caused by being grown in such environment.

      *Lamaster v. Indiana Department of Child Services* is even more analogous to the case at hand. There, the plaintiffs had two biological children when they decided to foster the Stacy Children. 2019 WL 1282043, *1 (S.D. Indiana, New Albany Division). While living with the plaintiffs, one of the foster siblings sexually abused plaintiffs' biological children. *Id.* The plaintiffs sued the department of child services for placing a minor child who had previously been sexually abused in their home. *Id.* The plaintiffs alleged that the department knew of the previous sexual abuse and did not disclose that information to them prior to placement. *Id.* The district court dismissed the case stating that the mere fact that the foster child might "be a higher risk to abuse other children does not plausibly suggest that the county defendants knew or suspected that [the foster child] would sexually abuse the Lamaster children." *Id.* at *3. Further, the court stated absent "any allegations from which a reasonable person could infer the county defendants' knew or suspected [the foster child] harbored inappropriate sexual tendencies toward other children, Plaintiffs' substantive due process claims . . . must be dismissed." *Id.*

      Here, as in *Lamaster*, the County Defendants had no knowledge that A.F. would act in such an egregious manner towards Jaxon Hunter. Simply because A.F. had exhibited sibling rivalry in her past, does not plausibly suggest that the County knew or suspected that A.F. could fatally harm a non-relative infant.

    **ii.**  **Neither the Placement of A.F. In The Sweeney Foster Home Nor the Licensing of Amber Sweeney's Foster Home Was The Proximate Cause Of. Jaxon's Death.**

Proximate cause "is a fact specific inquiry, involving the consideration of time, geography, range of potential victims, and the nature of the harm that occurred." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). The proximate cause requirement is not met unless a plaintiff can show that the danger created was a "foreseeable type of risk to a foreseeable class of persons." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 989 (7th Cir. 2021). A generalized risk of indefinite duration and degree is insufficient to establish proximate cause. *Id. citing Buchanan-Moore* 570 F.3d at 827. That is, the plaintiff must be the foreseeable victim of the state's actions. *Buchanan-Moore*, 570 F.3d at 828.

For example, in *Reed v. Gardner*, the Seventh Circuit held that the arrest of a sober driver of a car, while knowingly leaving behind a drunk passenger and the vehicle, was the proximate cause of the drunk passenger later driving the vehicle and crashing into the plaintiff's vehicle. 986 F.2d 1122, 1127 (7th Cir. 1993). In determining proximate cause, the court explained that the harm was foreseeable because the dangers associated with drunk drivers are "familiar and specific" and because the threat of harm to the other motorists was "limited in range and duration." *Id.*

By contrast, the Seventh Circuit found no limiting factors, and, therefore, no proximate cause in *Buchanan-Moore v. County of Milwaukee,* 570 F.3d 824 (7th Cir. 2009). There, the County failed to administer psychiatric medications to a mentally ill man in the County jail prior to releasing him and the man later committed a murder. *Id.* at 826-27. However, the Seventh Circuit held that there were no facts that would suggest that the man's "access to a gun, or propensity toward homicide, were specific dangers that were familiar to the County." *Id.* at 828. Additionally, the decedent was not a foreseeable victim because "a generalized, amorphous zone of danger is

insufficient to trigger a state duty to protect." *Id*. Finally, because the danger associated with the man stemmed from his mental illness, which existed "without temporal boundaries," the danger was "indefinite" and, therefore, not sufficiently limited in duration. *Id*. While tragic, the death "was simply too remote a consequence of the County's actions to hold the County responsible under civil rights law." *Id*.

Here, as in *Buchanan*, the death of Jaxon Hunter is too remote from the placement of A.F. such that the placement could be considered the proximate cause.

First, the harm caused by A.F. was not "familiar and specific." Chippewa County works with foster care children with varying levels of traumatic backgrounds. In 2018 alone, 84% of Chippewa County's 217 child out-of-home placements were related to caregiver methamphetamine use, similar to A.F.. Yet none of those children, nor any child in out-home-care in Chippewa County in at least the last ten years, has caused the death of another child. Such a statistic makes this case far removed from the immediate and direct foreseeable dangers found in other situations.

Additionally, there is absolutely no evidence in the record showing that A.F. had a history or propensity toward great bodily harm of another child. The only thing that can be found in A.F.'s history reveal at most instances of sibling rivalry and opposition toward her parents. However, not only were these instances not of the same tragic and impulsive reaction as A.F.'s actions towards Jaxon Hunter, but they were also limited to her time within her parent's chaotic, abusive, and drug-filled home. By all accounts, when A.F. was outside of the home – be that while she was in school or in the Sweeney foster home – such behavioral concerns completely subsided.  There is no record of physical abuse by A.F. to other persons at school, to other persons at the Sweeney home or to

other persons elsewhere. A.F. got along well in the Sweeney household, as exhibited both by the 41 days she stayed there without incident, and by Amber Sweeney's own testimony.

Thus, the County Defendants had no familiarity with the threat of a foster child causing the death of another child, nor were the County Defendants aware of any specific threat that A.F. could pose to another child.

Second, the alleged danger associated with A.F., as pled by Plaintiffs, is not limited in range and duration. A.F. had been in the Sweeney foster home in August 2018 without incident. A.F. was then placed in the Sweeney foster home again on September 19, 2018. In that time, 41 days passed without incident- without a single report that A.F. had engaged in aggressive or concerning behaviors or that she was threatening toward herself or any of the other children. Such a time lapse is too remote in comparison to the immediate threat seen in *Reed. See also*, *Martinez v. California*, 444 U.S. 277, 286 (1980) (murder that occurred 5 months after release of parolee "too remote a consequence" to be considered state action for civil liability to attach.)

Indeed, at no time during Chippewa County's entire involvement with A.F. did she exhibit any behaviors that could be construed as aggressive, combative, destructive, or otherwise concerning to the well-being of another human being, let alone children or infants, especially while she *was outside of her parents' home*. However, Plaintiffs' allegations portraying A.F. otherwise are insufficient to establish proximate cause under *Buchanan*.

Third, Jaxon Hunter was not a foreseeable victim. There is nothing in the record to indicate or even suggest that A.F. had harmed another child before, let alone to the degree in which Jaxon Hunter was harmed, or that the County social workers would have known he was at risk of harm by A.F. At most, A.F.'s records indicate she exhibited normal sibling rivalry with her brothers and was oppositional to her parents, who had utterly failed to provide her care, support, and shelter.

However, while outside the home, A.F.'s behavioral issues subsided and she seemed to do well in both Amber Sweeney's home and in school. Amber Sweeney testified that A.F. got along well in her household and that she did not witness A.F. exhibiting any concerning behaviors towards any of the other children in the home. A.F. is described by Amber as having a "good heart" and being "a sweet young lady." Moreover, Stefanie Hunter witnessed A.F. holding and caring for Jaxon Hunter without incident and without complaint. There are absolutely no facts to suggest that A.F. had previously been aggressive toward another child (apart from sibling rivalries with her brother), that she was a danger around infants, or that she was at all a threat specifically to Jaxon Hunter, whom she had been in proximity with for the better part of 41 days.

Fourth, the harm to Jaxon Hunter was simply too attenuated from the placement of A.F. to amount to proximate cause. At the time of the incident, A.F. was placed in the physical custody of Amber Sweeney,  who was then responsible for the day-to-day monitoring and care of A.F. It was also Amber Sweeney who was entrusted with the care of the daycare children, and specifically Jaxon Hunter, who was voluntarily enrolled in Amber Sweeney's daycare. Thus, Amber Sweeney assumed some amount of responsibility for both A.F. and Jaxon Hunter.

However, such responsibly was not exercised during the crucial moments at issue in this case. The incident occurred when Amber Sweeney failed to have sight and sound on both A.F. and Jaxon Hunter, as required by her licensing. A.F. was allowed to go into the Sweeney home, unsupervised, and to pick up Jaxon Hunter. Had Amber Sweeney had sight *or* sound on A.F. *or* Jaxon Hunter – two children entrusted into her care – it is unlikely that this incident would have ever happened.

Indeed, the State of Wisconsin, the entity responsible for issuing Amber Sweeney's daycare license – the license that placed Jaxon Hunter in her custody and spoke to the duties and

responsibilities *she owed* to Jaxon Hunter – cited her and threatened to revoke her childcare license before ultimately allowing her to voluntarily withdraw her childcare license. Thus, while the placement of A.F. in the Sweeney foster home 41-days prior to this incident is too attenuated to be the proximate cause in the death of Jaxon Hunter, Amber Sweeney's failure to have sight and sound on A.F. and Jaxon Hunter at the exact moment of the incident is not.

Finally, any allegation that the licensing of the Sweeney foster home as a dual-licensed daycare and foster care was the proximate cause to Jaxon's death is insufficient because the licensing of the Sweeney foster home did not present an immediate threat of harm and affected the public at large and not Jaxon Hunter specifically. *See e.g. Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002) (holding that plaintiff could not sustain a claim against the state for improper licensing after failing to conduct an investigation because improper licensing does not present an immediate threat of harm, the threat is not limited in range or duration, and the licensure affected the public at large and was not named at the specific plaintiffs, nor did such conduct shock the conscience.). Additionally, it is undisputed that combining foster care and daycares together does not present a concern in and of itself, and that it is common for foster care families to have other children in their homes.

### iii.  The Placement of A.F. In The Sweeney Foster Home Does Not Shock the Conscience.

The Due Process Clause is not violated by any form of negligence. *Daniels v. Williams*, 474 U.S. 327 (1986). Moreover, a violation of state law – such as the statutes governing the Department – is not a basis for liability under § 1983. *J.H ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (holding that a DCFS employee's dereliction of statutory duties in foster care placement did not form the basis of a 1983 claim); *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) ("It is

therefore a truism, reiterated many times by this court, that mere allegations of state law infraction are insufficient to support a Section 1983 claim.").

Thus, state action that shocks the conscience is conduct that is deemed "arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Only "the most egregious official conduct" constitutes such conduct. *Id*. A bad decision or negligent conduct does not suffice. *Id*. ("conduct intended to injure in some way unjustifiable by any government interest in the sort of official action most likely to rise to the conscience-shocking level."). A defendants' conduct that is "short-sighted, flawed, negligent, and tortious" does not rise to the level of conscience shocking. *Jackson v. Indian Prairie School Dist*. 204, 653 F.3d 647 (7th Cir. 2011).

Additionally, where public officials participate in reasoned deliberation in their decisions, the officials' conduct will only be deemed conscience shocking when it "evinces a deliberate indifference to the rights of the individual. *King ex rel King*, 496 F.3d at 819.

For example, in *Jackson v. Indian Prairie School Dist*. 204, the Seventh Circuit found that the continued placement of a special education student with a long history of verbal and physical outbursts, including hitting and scratching himself, other students and teachers, and throwing objects and chairs, did not shock the conscience when the student eventually attacked and harmed a teacher. 653 F.3d at 647. Multiple teachers and administrative officials had recommended that the child be transferred to a therapeutic day school due to his violent outbursts. *Id*. at 650. However, during regular reviews of the child's status, the school determined that his continued placement in the school's special education program was most appropriate, that is, until after the violent outburst toward a teacher. *Id*.at 650-653.

The *Jackson* court determined that the district's actions in continuing placement of the child in the special education program and not removing the child to a therapeutic day school *did*

*not shock the conscience* despite the acts of violence being frequent and unpredictable and the district's awareness of the same. *Id.* at 653. Rather, the court found that the following factors weighed in favor of a conclusion that the district's conduct did not shock the conscience: (1) the child's acts of violence were not against other people, but were against himself; (2) there were no reports of staff members, or anyone else, being fearful of harm at the hands of the child; (3) the district held regular meetings and evaluations of the child's needs and had always recommended the child's continued placement in the school. *Id.*

The *Jackson* case is analogous to the case at hand and this case should be decided similarly.

First, as described above, A.F. did not exhibit acts of violence towards others. As with the child in *Jackson*, A.F. reportedly engaged in superficial self-harming behaviors; however, such conduct was directed at herself and not at others.

Second, there are no reports of any individual being fearful of harm at the hands of A.F. A.F's mother sought to have her removed from the home due to A.F. having to face her abuser (a neighbor) regularly and A.F.'s difficulties in coping with the same. Amber Sweeney reported that she did not think "for one minute" that A.F. would harm another child in her home. Daniel Sweeney testified that "not in a million years" did he think A.F. would harm an infant. Both Plaintiffs in this case understood that "this could happen to anybody" and Stefanie Hunter previously witnesses A.F. holding and caring for Jaxon without concern for the same. It is undisputed that no one who came in contact with A.F. predicted that she would have intentionally injured another child.

Third, Chippewa County engaged in reasoned deliberation of A.F.'s placement and such deliberation does not amount to deliberate indifference. Prior to placing A.F. in the Sweeney foster home on September 19, Anderson conferred with his Chippewa County supervisor, Amber

Sweeney, and A.F.'s mother to discuss A.F.'s needs and to discuss the best placement option. Everyone involved -- that is, Anderson, Anderson's supervisor, Amber Sweeney, and A.F.'s mother -- determined that placement in the Sweeney foster home was the best, least restrictive, and most natural placement. Considerations during the deliberation included the following, among others: (1) A.F. was previously placed in the Sweeney's home and, therefore, A.F. and the Sweeneys were familiar with each other; (2) A.F. had previously done well in the Sweeney household during respite, a home that had many other children (both foster, daycare and their own); (3) A.F.'s mother approved of her placement there, and Amber Sweeney welcomed her into her home for this second time; (4) A.F. had built a rapport with Amber Sweeney, and there is an emphasis on the importance of existing relationships and not disrupting a child's life further with new relationships, and (5) A.F.'s assessed needed level of care (as determined by the CANS report) matched that of the Sweeney foster home. The decision to place A.F. in the Sweeney foster home was approved by court order just days after placement, further acknowledging the appropriateness and reasonableness of the above-described deliberations.

Fourth, for all the same reasons just noted, Chippewa County provided appropriate services to A.F. and appropriate information and support to the Sweeneys regarding the placement.

By example, A.F.'s family had been receiving family counseling and Anderson also initiated school-based counseling for A.F. Following A.F.'s CANS report indicating that she would benefit from counseling, Anderson also made a referral for A.F. to receive Comprehensive Community Services (CCS). CCS would provide A.F. with counseling and mental health support. Finally, Anderson remained in regular contact with A.F.'s family and, despite only be required to see A.F. once per month, Anderson saw A.F. almost weekly at the Sweeney foster home. During

31

his visits, and through communication with Amber Sweeney, there were no complaints or requests for further assistance or services from A.F., her family, or Amber Sweeney.

Additionally, Anderson and Chippewa County appropriately informed Amber Sweeney of A.F.'s background such that Amber Sweeney was knowledgeable of the child coming into her home.

First, Amber Sweeney had had A.F. in her home for respite previously and things had gone so well that Amber Sweeney was "happy" to have A.F. back in her home.

Second, Amber Sweeney acknowledge a general awareness of the following information in A.F.'s background: (1) A.F. was recently assaulted by a neighbor; (2) A.F. was trying to leave her home through a window and her father bruised her arm; (3) A.F. had been suicidal; (4) A.F. had been aggressive towards her brothers; (5) A.F.'s mother was chaotic and did not provide structure in the home and allowed her brothers to "run amuck;" (6) A.F.'s home life was "a volatile situation;" (7) there had been drug use in the home; (8) A.F. had been neglected; (9) A.F. had previously engaged in cutting and Amber had spoken to her about it; and (10) A.F. and her siblings had a "normal sibling rivalry."

Third, Amber Sweeney was provided appropriate documentation regarding A.F. Amber Sweeney provided the Sheriff's Department with a stack of papers including court documents, A.F.'s health identification card, a medical services consent form, a release of information authorization for Amber to receive all of A,F.'s medical information, and at least one other document that Amber Sweeney admits to shredding, among others. Additionally, Anderson completed an authorization for Amber to receive all information regarding A.F. from Chippewa Falls United School District and Anderson is certain that he provided the Out-of-Home Care Provider Part B form to Amber Sweeney, as was his practice.

While Amber Sweeney did not have access to A.F.'s entire social worker file – as such records are protected by Wis. Stat. § 48.78 and Wis. Stat. § 48.917(7) – she did have general knowledge of A.F.'s past sufficient to make sound decision-making regarding A.F.'s care. Regardless, there is no constitutional obligation to provide such information. *See Griffith v. Johnston,* 899 F.2d 1427, 1438 (5th Cir.1990) (rejecting the argument that parents had a "fundamental right" to be provided information by the state concerning children they were considering for adoption, noting that acceptance of plaintiffs' position would result in converting the state agency into the insurer of the children's health); *Hiser v. City of Bowling Green,* 42 F.3d 382 (6th Cir.1994) (the court held that plaintiff's claims were bared under DeShaney, when women was murdered by a police informant who had a violent criminal history, which the police knew about, but permitted the informant to reside with the women to monitor drug dealing activity without warning her); *Reed v. Know County Dept. of Human Services*, 968 F. Supp. 1212, 1215 (S.D. Ohio, Eastern Division) (holding that the county's failure to provide information to foster parents regarding a foster child, "in itself, does not provide plaintiffs with a basis for a § 1983 claim" and that "Deshaney would bar plaintiff's claim for the failure to provide information where the plaintiffs seek compensation for damages resulting from injuries caused by the foster children, who are private actors, and where no evidence has been offered that the defendants' conduct went beyond mere omissions and affirmatively limited plaintiffs' ability to protect themselves.").

Thus, Plaintiffs' Fourteenth Amendment claim must be dismissed. The Defendants did not increase the danger to Jaxon Hunter, the County Defendants' conduct was not the proximate cause to Jaxon Hunter's death, and because the actions of the County Defendants do not shock the conscience.

## II.   The Individual Defendants Are Protected By Qualified Immunity.

Governmental officials performing discretionary functions are shielded from liability insofar as their conduct does not violate any clearly established constitutional rights of which a reasonable person would have known. *Harlmv v. Fitzgerald,* 457 U.S. 800, 818 (1992); *Hinnen v. Kelly,* 992 F.2d 140, 142 (7th Cir. 1993). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick,* 123 F.3d 1005, 1008 (7th Cir. 1997), cert denied, 522 U.S. 1117 (1998).

A two-part test determines immunity:( 1) whether the plaintiff established a deprivation of a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne,* 526 U.S. 607, 609 (1999). "Clearly established" means that a constitutional right must have been identified in a particularized sense with regard to the circumstances of the alleged violation. *Warlick v. Cross,* 969 F.2d 303, 309 (7th Cir. 1992). Under qualified immunity, government officials may be protected from liability for objectively reasonable decisions, even if the decision is later determined to be wrong. *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir. 1988.)

Accordingly, a clearly established right cannot be shown with "high levels of generality." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). A plaintiff must provide "controlling authority" or "a robust consensus of cases of persuasive authority" holding that the conduct at issue is unconstitutional. *Id*. at 2023; *Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (constitutional right was not clearly established without analogous prior case law); *Stanton v. Sims*, 134 S.Ct. 3, 145 (2013) (qualified immunity applied where precedent "did not lay down a categorical rule for all cases" and was interpreted "too broadly."). The Supreme Court "has repeatedly told courts … not to define clearly established law at a high level of generality." *City of Escondido, California v. Emmons*, 139 S.Ct. 500, 503 (2019) (emphasis added).

For the reasons stated above, Plaintiffs have not established the violation of a constitutional right and, therefore, their Fourteenth Amendment claims against the individual Defendants must be dismissed.

Additionally, Plaintiffs cannot point to clearly established law giving notice of a constitutional violation. To defeat qualified immunity, Plaintiffs must allege more than that the state created danger exception is recognized by the Seventh Circuit. *Weiland v. Loomis*, 938 F.3d 917, 919-920 (7th Cir. 2019). Rather, a Plaintiff must search for cases with the appropriate level of generality such that the case "establishes the rule in a way that tells a public employee what the Constitution requires in the situation that employee faces. *Id*. at 930

Plaintiffs can point to no clearly established law regarding liability of the foster care placing agency following a foster child's injury to another child. Indeed, in the context of child placement, the Seventh Circuit has held only that that agency officials and case workers are liable only if they violated "the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser." *Lewis*, 308 F.3d at 774.

Additionally, violations of state law do not rise to the level of constitutional violations nor do they abrogate qualified immunity.  The Due Process Clause is not a "font of tort law." *Paul v. Davis*, 424 U.S. 693, 701 (1976). It is a restraint on the power of government to act and "generally confers no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney,* 489 U.S. at 196.

For example, in *Stevens v. Umsted,* 131 F.3d 697, 699 (7th Cir. 1997), while a child was a student at the Illinois School for the Visually Impaired ("ISVI") he was repeatedly sexually

assaulted by other students. His father filed a lawsuit against Umstead, the superintendent of ISVI after alleging that Umsted had a "duty to protect" the child from further assaults and that his failure to do so violated the child's due process rights. *Id.* The father's argument was primarily based on his assertion that Umsted failed to follow the Illinois Administrative Code, but the court noted that while "a violation of state laws may provide for a remedy in a state tort action, they do not clearly establish a violation of a constitutional right as required for a § 1983 action." *Id.* at 707. Further, the court noted that "[v]iolations of state laws do not abrogate an official's qualified immunity from suit for violation of federal constitutional rights." *Kompare v. Stein,* 801 F.2d 883, 888 n.6 (7th Cir. 1986). The court affirmed the district court's dismissal of the complaint on the grounds of qualified immunity. *Stevens,* 131 F.3d at 707.

Thus, even if a constitutional violation can be shown, Plaintiffs' Fourteenth Amendment claims are barred because Plaintiffs cannot prove that any such right was clearly established with the requisite level of specificity on September 19, 2018. Namely, Plaintiffs cannot demonstrate that courts in this jurisdiction have "clearly and consistently" held social workers constitutionally liable for harm caused by a foster child under the following circumstances: the foster child did not have a history of attacking or harming others; the foster child had a history of only sibling rivalry, an oppositional attitude toward her parents and superficial self-harming behaviors, however, such behaviors were limited only to when the child was in the custody of her parents and were not exhibited when the child was in foster care; the foster child's assessed needed level of care, as set forth in the CANS report, matched that of the provider's level of care; the social worker deliberated with a supervisor, the foster mother, and the biological mother and all determined that placement was appropriate; the foster child had previously been in the foster home without incident;  the foster child was in the foster home for 41 days without incident or complaint from the foster

mother, the foster child, or the foster child's biological parents and the foster child was reported to being doing well in said care; and the foster mother was familiar with the child and was provided general background information regarding all minor and major incidents in the child's home life. Nor is there a "robust consensus of cases of persuasive authority" placing these individuals on notice that they were in violation of the Constitution.

### III.   For the Individual Defendants, Personal Involvement is an Additional Necessary Prerequisite that Must be Established by Plaintiffs.

Plaintiffs' allegations are broad yet the involvement of the individual defendants is discrete, thereby requiring their theories of liability against the individual defendants to show the necessary personal involvement under § 1983 in addition to showing a constitutional violation and the absence of qualified immunity. Individuals may only be liable under § 1983 if they participated directly in the alleged constitutional violation. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). In other words, only persons who cause or participate in the alleged violation can be liable. *Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987) ("Each individual defendant can be liable only for what he or she did personally, not for any recklessness on the part of any other defendants, singly or as a group.").

Additionally, supervisory officials cannot be held liable under the doctrine of respondeat superior simply because they held a supervisory role. It is well established that a government official is only liable under § 1983 for his or her own misconduct.  *E.g., Locke v. Haessig*, 13–1857, 788 F.3d 662, 669, 2015 WL 3528782, at *5 (7th Cir. June 5, 2015). Thus, to recover damages against an official acting in a supervisory role, a §1983 plaintiff may not rely on a theory of Respondeat superior and must instead allege that the defendant, through his or her own conduct,

has violated the Constitution. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). For a supervisor to be liable, they must be "personally responsible for the deprivation of the constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). To show personal involvement, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988).

Here, by example, the record is bare of any facts alleging that Defendants Schultz or Easker were personally involved in any alleged constitutional deprivation relating to the decision-making of social worker Anderson. Schultz's only role was in the licensing of the Sweeney foster home. Additionally, Plaintiffs' Amended Complaint asserts liability of Easker – who had no involvement in licensing or placement decisions – under a theory of respondeat superior without alleging any particular personal involvement or other action showing he turned a blind eye. For these two defendants, the generic allegations in the Amended Complaint and their involvement as shown in the summary judgment record do not give rise to constitutional liability and, therefore, Defendants Schultz and Easker must be dismissed for lack of personal involvement.  Further, the same requirements must be met for social worker Anderson.  If Plaintiffs theory of liability is earlier licensing decisions or some other action for which Anderson was not involved, then he should be dismissed for want of the necessary personal involvement.

## IV.   Plaintiffs Have Not Adequately Pled Nor Can They Show Any Claims Against Chippewa County Under *Monell*.

Plaintiffs have not adequately pled any allegation involving entity liability under *Monell* nor did they name Chippewa County as a defendant, yet some of their allegations claim they sue the three individual defendants in their "official capacity" and other allegations raise *respondeat superior* theory.  Such allegations are insufficient to establish a claim under *Monell* because there

is no underlying violation, they have not adequately pled the same, and in any event the summary judgment record in this case nevertheless shows such a claim lacks sufficient support.

At a threshold level, there is no underlying constitutional violation.  To maintain a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must first establish that he suffered a constitutional injury.  "If a person has suffered no constitutional injury at the hands of [an official], the fact that the departmental regulations might have *authorized* [unconstitutional conduct] is quite beside the point." *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir.2010) ( "[A] municipality cannot be liable under Monell when there is no underlying constitutional violation by a municipal employee.").

Plaintiffs allege the three individual defendants (Easker, Schultz, and Anderson) are sued in their personal capacity and their "official capacity." Unlike individual capacity suits, "official-capacity suits ... `generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Here, that means that an official-capacity suit against defendants Easker, Schultz, and Anderson is, in reality, a suit against the County. *See id*. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). When faced with actions alleging both municipal and official capacity claims, the latter are properly dismissed as redundant. *Smith v. Metro. Sch. District*, 128 F.3d 1014, 1020 n. 3 (7th Cir. 1997). Consequently, the Court should dismiss these individually named defendants.

The Amended Complaint does not plead any claim against the Chippewa County.  Instead, it pleads a claim against the Department of Human Services.  A government's departments may not be sued under Section 1983. See *Best v. City of Portland*, 554 F.3d 698, 698 n.1 (7th Cir. 2009); *Buchanan v. City of Kenosha*, 57 F. Supp. 2d 675, 678 (E.D. Wis. 1999) (collecting cases).

To the extent that the Chippewa County Department of Human Services forms a part of the county government that they serve, they are not "legal entit[ies] separable from the county government," so they are not subject to suit. *Whiting v. Marathon Cnty. Sheriff's Dep't.*, 382 F.3d 700, 704 (7th Cir. 2004).

Nor does the Amended Complaint otherwise adequately plead a claim against Chippewa County. *Monell* claims are subject to the pleading standard set out by the Supreme Court in *Twombly* and *Iqbal*. *McCauley v. City of Chi.*, 671 F.3d 611, 615 (7th Cir. 2011). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At a minimum, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states a plausible claim is context-specific, requiring the court to draw on its experience and common sense." *Id.* at 556. "Because a *Monell* claim is complex, more factual specificity is required to sustain [it]." *Braun v. Abele*, No. 15-CV-252-JPS, 2015 U.S. Dist. LEXIS 82574, *12-13, 2015 WL 3904960 (E.D. Wis. June 25, 2015) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 616-617 (7th Cir. 2011) ("The required level of factual specificity rises with the complexity of the claim") and *Swanson*, 614 F.3d at 405). "This specificity is necessary to 'satisfy the rigorous standards of culpability and causation required for municipal liability.'" *Braun*, 2015 U.S. Dist. LEXIS 82574, *13 (citing *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009)).

Here, the Amended Complaint is devoid of allegations that would support a *Monell* claim. *Monell*'s particular requirements are discussed further below, but for purposes here it is notable the Amended Complaint lacks any allegations of an official policy, widespread custom or practice or constitutional harm caused by a final policymaker.  Instead, the Amended Complaint has several allegations using the conclusory statements of *respondeat superior* (particularly against defendant Easker).  Such allegations miss the mark.

Even looking beyond these threshold defects in any such claim, the Plaintiffs cannot show sufficient evidence to create a genuine issue of material fact that Chippewa County can be held liable under Section 1983.  "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Under *Monell*, municipal liability exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id*. at 694. The Seventh Circuit has identified three different ways in which a municipality or other local governmental unit might violate § 1983: (1) through an express policy, statement, ordinance, or regulation that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). *Monell's* rules and requirements apply equally to any claim for an injunction against the municipality. *See Los Angeles County v. Humphries*, 562 U.S. 29 (2010).

Here, Plaintiffs cannot meet these stringent standards.

*First,* Plaintiffs have neither pled nor can they show any official unconstitutional policy. Bare allegations of an unconstitutional policy cannot give rise to *Monell* liability: "[l]ocating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). *See also Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017) ("The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?"). Thus, because Plaintiffs have not identified any unconstitutional policy, any claim of the same under *Monell* on a theory of unconstitutional policy of Chippewa County's must fail.

*Second,* Plaintiffs have not pled and cannot establish a custom or practice claim. To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir 2010). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id*. Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, "what is needed is evidence that there is a true municipal policy at issue, not a random event.

Proof of deliberate indifference can take one of two forms: (1) "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers

of the city can reasonably be said to have been deliberately indifferent to the need"; or (2) repeated pattern of constitutional violations" made the deficiencies in the systems "plainly obvious to the city policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

Deliberate indifference is a high bar, one which Plaintiffs have failed to meet here. There is no evidence in the record to suggest a deprivation so widespread so as to constitute deliberate indifference. Rather, Plaintiffs merely allege in their Amended Complaint that "[t]he decision made to place A.F. in this foster home . . . is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the decision was not based on such judgment." (Dkt. 21 ¶ 26). Such bare allegations cannot give rise to liability under *Monell.*

Indeed, it is undisputed that, in 2018, Chippewa County served 217 children in out-of-home care, including foster care, kinship, and residential placement. Approximately 84% of those placements were related to caregiver methamphetamine abuse, similar to A.F. However, in the previous ten years, and apart from A.F., no child in placed by Chippewa County in out-of-home care has caused the death of another child. Nor can Plaintiffs point to any other instances of allegedly inappropriate placement, placement of an allegedly dangerous child in an inappropriate placement, or the alleged failure to provide information about a foster child to an out-of-home care provider. Thus, there is no evidence in the record to suggest that Chippewa County had a widespread issue involving foster care placement such that policymakers could be determined to be deliberately indifferent.

*Third*, Plaintiffs have neither pled nor can they identify sufficient evidence to support a claim against the County under a final policymaker theory.  To be a final policymaker, an official must be "responsible for establishing final government policy on a particular issue." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 675 (7th Cir. 2009). An individual or entity is not a final

policy maker under Section 1983 if its decisions are reviewable by a higher municipal authority. *Rasche v. Vill. of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003.) More specifically, "the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that *there is no higher authority*." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir.2001). Here, no such allegations are made and the summary judgment record does not reveal that the only supervisory official identified by Plaintiffs – Timothy Easker – has the requisite authority over and above the state statutes governing placement and the governance of the County Board.

## CONCLUSION

For the reasons explained above, Chippewa County Department of Human Services, Tim Easker, Serena Schultz, and Matthew C. Anderson respectfully ask the Court to grant their Motion for Summary Judgment and dismiss all claims as a matter of law.

Dated this 9th day of April 2021.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**

Attorneys for Defendants, Chippewa County Department of Human Services, Tim Easker, Serena Schultz and Matthew C. Anderson

By:___/s/ Samantha R. Schmid_____
      REMZY D. BITAR
      State Bar No: 1038340
      SAMANTHA R. SCHMID
      State Bar No. 1096315

P.O. ADDRESS:
730 N. Grand Avenue
Waukesha, WI 53186

O: (262) 548-1340
F:  (262) 548-9211
E: rbitar@ammr.net
sschmid@ammr.net