IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STEFANIE D. HUNTER, NATHAN A. LIEDL, and
ESTATE OF JAXON HUNTER,

Plaintiffs,

v.                                                    OPINION and ORDER

CHIPPEWA COUNTY DEPARTMENT OF HUMAN                   20-cv-61-jdp
SERVICES, TIM EASKER, SERENA SCHULTZ, and
MATTHEW C. ANDERSON,

Defendants.

Six-month-old Jaxon Hunter was at an in-home daycare where a troubled ten-year-old girl, A.F., had been placed in foster care. Jaxon was crying in his crib, so A.F. picked him up to soothe him. But A.F. dropped him, panicked, and kicked his head. Hunter died from his injuries.

This horrible incident is in federal court because A.F.'s foster care placement was the result of government action. Plaintiffs, Jaxon's parents and his estate, contend that the government officials responsible for placing A.F. in the foster home deprived Jaxon of his rights under the Fourteenth Amendment to the United States Constitution. Plaintiffs invoke what is called the "state-created danger" principle, which is an exception to the general rule that government officials have no duty to protect individuals from dangers posed by third parties. Plaintiffs' core argument is that A.F. was so obviously dangerous that placing her in foster care in a home that also provided daycare services demonstrates deliberate indifference to the danger that she posed to the other children in the daycare.

Defendants move for summary judgment on several grounds, contending that plaintiffs cannot satisfy any of the elements of a state-created danger claim, that the individual

defendants are entitled to qualified immunity, and that there is no evidence of any unlawful policy or practice to support a claim against the county itself. Dkt. 76.

The court will focus on a single decisive issue. To establish a claim based on a state-created danger, a plaintiff must show governmental conduct that "shocks the conscience," which requires a showing that the government defendant recklessly disregarded a known or obvious risk of injury. This is a high standard that excludes all but the most egregious conduct. Negligence, or even gross negligence, is not enough to support such a claim.

In this case, the underlying material facts are undisputed, and those facts show that A.F. was a deeply troubled child from a dysfunctional and abusive home. Plaintiffs adduce expert reports that criticize defendants' placement decision. But the experts suggest that defendants' decisions demonstrate, at most, errors of judgment and negligence; they do not suggest that defendants recklessly disregarded a risk that A.F. would cause harm to another child. The record shows that A.F. had some behavioral issues and mental health struggles, but those behaviors did not indicate that A.F. was violent. A.F. had done well in foster care placements away from her chaotic family. And although A.F. had been aggressive towards her family and a boy who sexually assaulted her, those isolated incidents do not suggest that A.F. posed an obvious risk of harm to children in her foster home. Even viewing the facts in the light most favorable to plaintiffs, they have not adduced evidence of governmental misconduct that rises to the level of a constitutional violation. The court will grant defendants' motion and dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

2

A.F. is a child who was in foster care with Chippewa County. A.F. has had a difficult life. Her parents were addicted to drugs, and she was often neglected or abused. Chippewa County's contact with A.F. began after a report of neglect was made to the Chippewa County Department of Human Services in September 2017. A.F. was then nine years old. Chippewa County investigated A.F.'s home and determined that she was the victim of severe neglect. The county assigned A.F. to an ongoing caseworker, defendant Matt Anderson, and placed A.F. and her siblings in foster care.

In October 2017, a county employee completed a Child and Adolescent Needs and Strengths (CANS) assessment for A.F. As the name suggests, CANS is a screening tool used to evaluate a child's needs and strengths to evaluate a foster care placement. Based on the answers entered in the screening tool, an algorithm will calculate a child's level of need, which ranges from one to six, where one is minimal care and six is a very high level of care. The initial CANS report indicated that A.F. needed a level one or level two foster home. Anderson completed another CANS assessment for A.F. in January 2018 that produced the same result.

Through his contacts with A.F.'s family, Anderson came to learn about some of A.F.'s behavioral issues. A.F. would throw intense tantrums and tried to run away from home. She would sometimes pinch and hit her younger brothers, and she could be physically aggressive with her parents. Anderson believed that A.F. was typical of foster children who had experienced trauma and neglect. Dkt. 44 (Anderson Dep. 18:15-21). Most of A.F.'s behavioral issues were isolated to her home life, and Anderson thought that her problems were caused from the chaos of her home and her unstable relationship with her parents. *Id.* at 29:9-16.

After her initial foster placement, A.F. was returned to her home in April 2018. In August, A.F. was sexually assaulted by a neighbor child. The assault took a toll on A.F.'s mental

health, and she began engaging in self-harm. A.F.'s mother was concerned for A.F., so she drove A.F. to a nearby hospital and sought to have her voluntarily committed. At the hospital, A.F. reported that she had suicidal thoughts, but she denied wanting to act on those thoughts. Hospital staff determined that emergency detention and medical treatment were not necessary, but they notified Chippewa County about the assault.

The county investigated the assault and A.F.'s hospitalization. The county learned that A.F. had made superficial cuts to her wrists and between her fingers. The county also learned that A.F. had been in a fight with the neighbor child who sexually assaulted her. The neighbor child had continued to harass A.F. after the assault, and he did not move away from A.F. after she asked him to. The county's report says that that A.F. started "hitting and punching" the neighbor child. Dkt. 40-2, at 29. A.F.'s father later said that A.F. "beat the sh*t" [sic] out of him. Dkt. 102, ¶ 6.

The county determined that A.F. was struggling with her emotions and mental health after the assault. At the end of August 2018, the county decided to place A.F. with Amber Sweeney for a "respite"—a short placement allowing for a cooling-off period between children and parents. Amber and her husband, Dan, are licensed foster care parents. Amber and Dan had fostered other children who had experienced neglect and emotional abuse, and their home was licensed as a level two foster home, which matched A.F.'s assessed level of need. Amber also operates a licensed daycare, Amber's Pals & Playmates, out of her home. Amber had received approval from the state and the county to run a daycare with foster children in the home.

Amber did not observe A.F. exhibiting any concerning behavior during her stay with the Sweeneys. A.F.'s respite stay at the Sweeney home was short, as planned, and A.F. was soon returned to her family.

But on September 19, 2018, Chippewa County was informed that A.F. had bruises on her arms and may have been the victim of domestic violence. A.F.'s father told Anderson that he had bruised A.F. when he had to restrain A.F. from running away. The county sought to remove A.F. from her home immediately to ensure her safety. Because A.F.'s initial placement with the Sweeneys had been successful, Anderson considered returning her to the Sweeney home. A.F. told Anderson that she did not want to return to the Sweeneys because she would prefer to stay in a home with fewer children. Dkt. 44 (Anderson Dep. 59:17-21). But Anderson conferred with Amber Sweeney, A.F.'s mother, and his supervisor, and all determined that placement with the Sweeneys was the best option. A.F. was placed back in the Sweeney home that same day.

A few days later, the Chippewa County Circuit Court issued an emergency order approving A.F.'s placement with the Sweeneys. The court concluded that a change in placement was warranted because A.F. had "become physically aggressive with her parents and younger brothers" and had "engaged in behaviors that are dangerous to her own safety, including running away with no regard for the dangers to her own safety." Dkt. 40-2, at 1.

A.F.'s second placement in the Sweeney home was initially successful. Amber Sweeney did not observe A.F. throw any tantrums or demonstrate any aggression. A.F. began attending counseling, where she reported that she was not feeling homicidal or suicidal.

At some point in 2018, plaintiff Stefanie Hunter enrolled her infant son, Jaxon Hunter, at Amber's Pals & Playmates daycare. Stefanie's older child, A.H., had been enrolled there for

several years. Stefanie knew that the Sweeneys were foster parents, and Stefanie met A.F. when A.F. was placed with the Sweeneys in September 2018. When Jaxon was at the daycare, A.F. would often play with him or hold him in her arms.

On October 30, 2018, A.F. was alone in the Sweeneys' home with Jaxon. Jaxon was sleeping in his crib and Amber was outside blowing leaves with the five other children under her care. From Amber's position outside, she could not see or hear Jaxon or A.F., but A.F. later reported what happened. A.F. heard Jaxon crying, so she picked Jaxon out of his crib and attempted to hold him. Jaxon slipped out of A.F.'s arms. Jaxon hit his head on a stool and then landed on the floor and continued crying. A.F. became scared and stomped on Jaxon's head so she would not get in trouble. A.F. picked Jaxon up, placed him back in his crib, and told him she was sorry.

Upon discovering Jaxon, Amber immediately called 911. Jaxon died from his injuries two days later.

## ANALYSIS

Plaintiffs contend that the Chippewa County Department of Human Services and its employees deprived Jaxon of life without due prosses by exposing him to the danger of injury by A.F. The Due Process Clause does not generally impose a duty on the government to protect citizens from injury at the hands of third parties. *DeShaney v. County of Winnebago*, 489 U.S. 189, 196 (1989). But there are two exceptions to that general rule. First, individuals in government custody have a due process right to protection by virtue of the state's control over the individual. *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) (citing

*Deshaney*, 489 U.S. at 199). Prisoners, for example, have a right to be protected from known threats from other inmates.

A second exception is at issue in this case. Under what is usually referred to as the state-created danger doctrine, the government is obliged to protect an individual from dangers that the government itself has created or aggravated. *Id*. Plaintiffs assert claims under the state-created danger doctrine, contending that the danger posed by A.F. was one created by defendants when they placed A.F. in the Sweeney foster home.

### A. State-created danger claim

To prevail on their state-created danger claim, plaintiffs would have to show that: (1) defendants, by their affirmative acts, created or increased a danger that the plaintiff faced; (2) defendants' failure to protect the plaintiff from danger was the proximate cause of plaintiff's injury; and (3) defendants' conduct was so arbitrary and irrational that it shocks the conscience. *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011).

As a preliminary argument, defendants contend that the "state-created danger" doctrine is not a valid theory of constitutional liability. Defendants say that the Supreme Court has never endorsed the "state-created danger" theory of liability and that the doctrine rests on an impermissibly broad reading of the Court's decision in *DeShaney*. Defendants' argument finds some support in a recent decision of the court of appeals. *See Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019). The court of appeals expressed skepticism about whether the Seventh Circuit's three-element test is consistent with *Deshaney*. *Id*. at 921. But the Seventh Circuit has not overruled its precedent concluding that "the state created danger exception to the rule in *DeShaney* is [] well established" in the Seventh Circuit, *Johnson v. Rimmer*, 936 F.3d 695, 708

(7th Cir. 2019). The court will address plaintiffs' claim on the merits, following the three-element approach.

Defendants have creditable arguments for why plaintiffs cannot meet their burden on any of the elements of their state-created danger claim. As for the first element, there is an "essential distinction between endangering and failing to protect." *Sandage v. Board of Comm'rs of Vanderburg County*, 548 F.3d 595, 599 (7th Cir. 2008). Defendants have a reasonable argument that plaintiffs' claim is not based on a danger they created, but based on the failure to protect Jaxon from an improbable act of violence. As for the second element, defendants have a good argument that the placement decision was not the proximate cause of Jaxon's death. A governmental actor's affirmative act is the proximate cause of a harm if it is foreseeable that the victim would be injured by a familiar and specific harm. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009). Amber was required by the terms of her license to provide constant, direct supervision of the children in her care. Dkt. 38-6, at 3. So the immediate causes that led to Jaxon's death—that Amber would leave A.F. unsupervised, and that A.F. would accidentally drop Jaxon and kick him out of fear—are certainly not familiar and specific risks foreseeable from the foster care placement decision.

The court will focus its analysis on the third element, which requires plaintiffs to show that defendants' conduct was so arbitrary and irrational that it shocks the conscience.

### B.  The shocks-the-conscience standard

The shocks-the-conscience standard is a high bar, excluding all but the most egregious and outrageous government conduct. *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021). Even conduct that is "short-sighted, flawed, negligent [or] tortious" is not enough to shock the conscience. *Jackson*, 653 F.3d at 654. When time allows officials to make reasoned

deliberations about their decisions, as in this case, conduct is conscience-shocking if it reflects deliberate indifference to the plaintiff's rights. *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007). Deliberate indifference requires actual knowledge of a risk, or at least that the risk was obvious. *Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027, 1030 (7th Cir. 2012) (the precise state of knowledge required remains unsettled). In practice, the difference between a known risk and an obvious one is usually unimportant. *Id.*

Plaintiffs have not adduced evidence that defendants were deliberately indifferent to the risk that A.F. would harm Jaxon. Plaintiffs have adduced expert testimony opining that defendants should not have placed A.F. in a daycare with other children, which the court will address more thoroughly below. But nothing in the record would lead defendants to believe that A.F. would harm another child.

Nothing in A.F.'s history suggests that she posed an obvious risk of physical harm to the children at Amber Sweeney's daycare. A.F. had some struggles with her behavior and mental health, but violent or aggressive behavior was rare. A.F. could be physical with her brothers, but Anderson understood it to be nothing more than "typical sibling fighting." Dkt. 44 (Anderson Dep. 99:24-100:2). The most significant act of violence in A.F.'s history was her fight with the neighbor child who had sexually assaulted her. The parties disagree about the severity of the fight, and it is unclear from the record how much Anderson knew about it. A.F.'s father said she "beat the sh*t" out of the neighbor child, Dkt. 102, ¶ 6, but that vague characterization would not be sufficient to establish that A.F. had done more than punched him. More important, this was an isolated incident, directed against the boy who had sexually abused A.F. and continued to harass her, even after A.F. asked him to stop. It was not obvious that she would behave similarly towards the children at Amber's daycare. Other than the

"physicality" with her family members and the incident with the abuser, there is no other evidence of A.F. being physically violent against anyone.

Anderson also had good reasons to believe that A.F.'s behavior would improve when she was removed from her home. A.F. was doing well in school, and her teachers described her sweet and respectful. Dkt. 79-1. Although A.F. once threw a tantrum when her mom dropped her off at school, her teachers did not observe any behavioral incidents in the classroom. *Id.* And A.F. was doing well in the Sweeney home. Amber Sweeney did not see A.F. demonstrate any concerning behavior during her initial respite placement. A.F. was not aggressive with Amber or other children. And in her second placement, A.F. lived with the Sweeneys without issue for more than a month before the tragic incident with Jaxon.

*Jackson* provides a useful comparison to this case, because it also concerns the risk that a child might cause injury to a third party. *Jackson* involved an elementary-school student with a history of violent outbursts. 653 F.3d at 649. After one such outburst, the principal thought that the student had calmed down and sent the student's assigned special-education teacher to discuss the incident with him. *Id*. The student became agitated again and swung a chair at the teacher, who fell and was injured in trying to protect herself. *Id.*

That student had a demonstrated history of violence, and teachers and other parents had asked that he be removed from the school. Over the course of two years, the student was frequently physically aggressive toward others. *Id*. at 650–54. In the 2007–08 school year, the staff reported more than 11 incidents of physical assaults against them. *Id*. at 652. At some point, the violent outbursts became so common that teachers stopped documenting them all. *Id.* at 650–51. The student had punched and kicked his teachers, *id*. at 652, threw a chair at a teaching assistant, *id*., and stabbed a student with a pencil, *id*. at 650. His outbursts were

unpredictable, which created a "precarious environment for all who were around him." *Id.* at 655. The principal even received an anonymous letter stating that the student was a danger to the school. *Id.* at 651. Despite this history, the principal declined to transfer the student out of the school, and declined to reassign the teacher who was injured. And yet the court concluded that the principal's actions did not shock the conscience. *Id.* at 655. Although it was a "close question," the decision not to transfer the student was not so egregious that it violated the Constitution. *Id.*

The risk that A.F. would cause harm to a child at Amber's daycare was less obvious than the risk that the student in *Jackson* would cause harm to a teacher. The student in *Jackson* had a long history of violent incidents, but A.F. had only a few. Jackson's outbursts were unpredictable, but A.F.'s aggression had specific triggers. And the principal in *Jackson* had been warned that the student was dangerous. By contrast, there is no evidence that people suspected A.F. would harm a child at the daycare. Amber Sweeney reported that she never thought that A.F. would harm another child in her home, Dkt. 39-1, at 12, and Daniel Sweeney testified to the same effect, Dkt. 28 (Daniel Sweeney Dep. 30:1–4).

Plaintiffs have not adduced evidence that shows A.F. posed a more obvious risk of harm than the student in *Jackson*. Plaintiffs argue that the teacher in *Jackson* could defend herself and could have quit her job if she wanted. But the teacher's capacity for self-protection was not cited by the court in concluding that the principal's actions did not shock the conscience. *Jackson*, 653 F.3d at 655–56. Instead, the court noted that teachers were not afraid of the student, that the student's violent outbursts were becoming less frequent, and that special education teachers believed that the student's needs were best met in a general educational classroom. *Id.* Similar factors support a conclusion that defendants' decisions about A.F. do not

11

shock the conscience. No one feared that A.F. would harm another child, she displayed no aggression or behavioral issues in the Sweeney household, and all of A.F.'s caretakers believed that foster placement with the Sweeneys was the best option for her.

## C. Plaintiffs' evidence

Plaintiffs have two main reasons for their argument that defendants' actions shock the conscience. First, plaintiffs cite the opinions of their expert, Dr. Kathryn Seifert. Seifert, a psychologist specializing in violence prevention, opined that defendants made errors in professional judgment in the way they handled A.F.'s placement and should have known that A.F. could harm another child. Second, plaintiffs say that Matt Anderson demonstrated deliberate indifference by not telling Amber Sweeney everything he knew about A.F.'s background. Viewing the record in the light most favorable to plaintiffs, plaintiffs may be able to show that defendants acted negligently. But for the reasons that follow, no reasonable jury could conclude that defendants disregarded an obvious risk of harm that A.F. posed to the children in Amber Sweeney's daycare.

### 1. Dr. Seifert's report

Dr. Seifert's report offers three reasons for why defendants' behavior shocks the conscience. First, and most directly, Seifert opines that defendants were deliberately indifferent to A.F.'s needs. *See* Dkt. 89, at 6. Seifert says that defendants should have provided more mental health and support services to A.F. But to prevail on a state-created danger claim, plaintiffs must show that defendants were deliberately indifferent to *Jaxon's* rights, not to A.F.s.

At the end of her report, Seifert says that defendants were deliberately indifferent to the rights of "vulnerable children in the . . . foster care system, which included Jaxon Hunter." Dkt. 89, at 32. But Seifert does not define the legal concept of "deliberate indifference" in her

report, so her bottom-line opinion is merely an unsupported legal conclusion. Such conclusory opinions are not admissible evidence and cannot defeat summary judgment. *See Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) (experts cannot provide legal conclusions); *Thomas v. Christ Hosp. & Med. Ctr.,* 328 F.3d 890, 892-93 (7th Cir. 2003) (conclusory allegations do not defeat summary judgment).

Second, Seifert says that Matt Anderson scored A.F.'s CANS report incorrectly, and thus under-reported A.F.'s level of need. Anderson gave A.F. a score of "0," the lowest rating, to items including suicide risk, behavioral aggression, and "runaway," even though Anderson knew that A.F. had issues in those categories. Plaintiffs contend that if Anderson had scored A.F.'s CANS assessment properly, A.F. would not have been placed in Amber Sweeney's level two foster home.

Even if Anderson made errors in filling out the CANS report, that does not demonstrate that he was deliberately indifferent to the risk that A.F. would harm another child. A higher CANS score would tell Anderson that A.F. needed more services and a higher level of care. But Seifert does not contend that a correctly-scored report would make Anderson aware that A.F. would harm other children in the daycare. And Anderson had reasons to believe that it was appropriate to place A.F. in the Sweeneys' level two foster home in addition to the CANS score. It is undisputed that A.F. had done well in her initial stay with the Sweeneys, and Anderson, Amber Sweeney, and A.F.'s parents all agreed that it would be appropriate to place A.F. with the Sweeneys again. The errors in the CANS report suggest negligence; plaintiffs have no evidence that Anderson intentionally falsified the CANS report. But mere negligence of that sort does not shock the conscience. *Jackson*, 653 F.3d at 654.

13

Third, Seifert's report says that literature in her field shows that A.F.'s risk factors—including a history of sexual abuse, neglect at home, and thoughts of suicide—correlate with violence. Dkt. 89, at 24 ("Having multiple risk factors increases the probability that the youth without effective interventions will commit a violent act."). In her deposition, Seifert made a bolder probabilistic estimate: without effective treatment, there is a "high degree of probability" that a child with a history of sexual abuse will cause harm to another human being. Dkt. 86 (Seifert Dep. 86:12–87:1).

But Seifert's probabilistic estimate would not be admissible for two reasons. First, she would not be allowed to offer the probabilistic estimate at trial because it had not been disclosed in her expert report. *See* F.R.C.P. 26(a)(2)(B)(i); *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) ("expert reports must be 'detailed and complete.'"). Second, the probabilistic estimate contradicts her own report. Seifert's report says that her "risk assessment" model for children A.F.'s age should only be used for treatment and risk reduction, and it "should never be used for probability assessment." Dkt. 89, at 22. Seifert's deposition testimony cannot establish that there was a high degree of probability A.F. was likely to cause harm to children in the daycare.

There is yet another problem with Seifert's assessment of the child violence literature: plaintiffs have adduced no evidence that defendants were familiar with that research. Indeed, plaintiffs' other expert, Abigail Rich, is a trained social worker and she was unaware of the literature that Seifert relied on. Dkt. 88 (Rich Dep. 166:9–168:24)). Plaintiffs have adduced no evidence that an ordinarily qualified social worker, such as Anderson, would have been aware of the literature that Seifert cited.

Seifert's report at most shows that, as a best practice, a social worker should provide appropriate treatment to children who have experienced trauma, such as sexual abuse, to reduce the risk of future violence. But it does not show that any competent social worker would have recognized that A.F., with her traumatic history, posed an obvious risk of violence to other children.

### 2. Failure to fully inform Amber Sweeney

Plaintiffs contend that Anderson was deliberately indifferent in failing to fully inform Amber of pieces of A.F.'s background. Plaintiffs concede that omitting information about A.F.'s background would not itself qualify as an "affirmative act" that could sustain a state-created danger claim. Dkt. 98, at 48. But they contend that if Amber had been fully informed about A.F.'s background, she would have supervised A.F. and Jaxon more carefully, which would have prevented Jaxon's death. Plaintiffs also fault Anderson for failing to provide Amber with the state-mandated "out of home care" form that had information on A.F.'s background.

None of Anderson's omissions demonstrate that he was deliberately indifferent to the risk that A.F. would harm another child at the daycare. The court starts with the out-of-home care form. Anderson testified that he is "certain" that he provided the form. Dkt. 44 (Anderson Dep. 39:4–6). But Amber does not recall receiving the form, and she admitted to investigators that, after the incident, she shredded some documents that she had received from Anderson. Dkt. 39-1, at 12. In light of Anderson's unequivocal testimony, Amber's lack of memory does not create a genuine dispute of fact about whether she got the form. Regardless, Amber acknowledges that she was aware of the most important pieces of A.F.'s background, including A.F.'s aggression toward her brothers, her history of abuse, and her self-harm. Anderson was

also in frequent contact with Amber and was available if she had questions or concerns about the placement. Dkt. 29 (Sweeney Dep. 90:19–25).

Plaintiffs say that Amber should have been explicitly told that A.F. threw a tantrum at school; that A.F. told Anderson that she did not want to be placed in the Sweeney home; and that A.F. had written "death" on her arm following her visit to the hospital. *See* Dkt. 113, at 30. If Amber had known these facts, perhaps she would have been on the lookout for tantrums or incidents of self-harm. But given Amber's general knowledge of A.F.'s traumatic background, no reasonable jury could find that these additional facts would have changed Amber's treatment of A.F. And, more important, Anderson's failure to provide these details, intentional or not, does not suggest any lack of care for the safety of other children in the daycare. These additional facts simply add too little to the information that Amber already had.

Plaintiffs have not adduced evidence from which a reasonable jury could find that any aspect of Anderson's conduct was so egregiously wrong that it shocks the conscience.

## D. Remaining claims and defendants

Plaintiffs concede that Tim Easker, the director of the Chippewa County Department of Human Services, and Serena Schultz, Matt Anderson's supervisor, were not directly involved in the foster placement decision. Dkt. 98, at 66. The individual capacity claims against these two defendants will be dismissed.

Plaintiffs' claim against the Chippewa County Department of Human Services is based on the theory that Jaxon's rights were violated as a result of a policy or practice of the department. Because the court concludes that there is no underlying constitutional violation, this claim necessarily fails. *See Sallenger v. City of Springfield,* 630 F.3d 499, 504 (7th Cir. 2010).

That leaves the claims against Easker and Anderson in their official capacities. But a claim against an officer in his official capacity is legally redundant to a claim against the government entity he works for. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Because the claim against the department fails, the official capacity claims against Easker and Anderson must be dismissed as well.

CONCLUSION

Viewing the summary judgment record in the light most favorable to plaintiffs, the court concludes that a jury could find that the county should have assessed A.F. a higher level of need and offered her more mental health services. But no reasonable jury could conclude that defendants were deliberately indifferent to an obvious risk of harm to anyone in the Sweeney foster home or daycare. Defendants surely knew that A.F. was a troubled child. But children in foster care are inevitably troubled, and many have suffered from severe trauma or neglect. Plaintiffs' argument, if accepted, would mean that a troubled child like A.F. could never be placed in a foster home with other children.

A.F. did not pose an obvious risk of harm to Jaxon or other children in the daycare, so the decision to place A.F. did not violate the constitution.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 76, is GRANTED.

2. Defendants' motion to exclude the expert testimony of Kathryn Seifert, Dkt. 119, is DENIED as moot.

17

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered March 7, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge